

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00058-CR

_____

DON PARR BOSWORTH, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2010-F-00223

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

# O P I N I O N

Don Parr Bosworth, Jr., commenced his incarceration on May 10, 2010, for the charge of indecency with a child by exposure[1] and was indicted for the offense in the July 2010 term of a Cass County grand jury. By December that year, he had not been tried and so filed a motion for speedy trial asking to be tried on or before February 1, 2011.[2] More informally, Bosworth's counsel sent a letter to the prosecutor June 16, 2011, calling attention to the fact that there had yet to be any trial setting and requesting one as soon as possible. In February 2012, Bosworth filed a motion to set aside the indictment on speedy trial grounds. He was not tried until April 2012. Before voir dire, a hearing was held, and the trial court denied Bosworth's request for dismissal of the charge.[3] After reviewing the record and weighing the *Barker v. Wingo*[4] factors, we find Bosworth's speedy trial rights were violated.

## Right to a Speedy Trial

The Sixth Amendment to the United States Constitution guarantees the citizenry the right to a speedy trial. This right protects the accused from anxiety and concern that accompanies a public accusation, seeks to avoid impairment to a defense, and assures freedom from oppressive

---

[1]*See* TEX. PENAL CODE ANN. § 21.11(a)(2) (West 2011).

[2]Although Bosworth's motion was dated December 3, 2010, and requested that he be granted a trial date "on or before 2-1-2010," we feel certain that this was a typographical error and that he was seeking a trial date the February following the filing of the motion. It is significant that this motion made no mention of a desire to dismiss the cause of action for failure to grant a speedy trial but requested only that a trial be scheduled.

[3]Bosworth was found guilty by a jury and sentenced to six years' incarceration.

[4]407 U.S. 514 (1972).

2

pretrial incarceration.  *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008) (citing *Barker*, 407 U.S. at 532).

The right to a speedy trial cannot be quantified in days or months.  *Barker*, 407 U.S. at 523.  Thus, Texas courts "analyze federal constitutional speedy-trial claims 'on an ad hoc basis' by weighing and then balancing the four *Barker v. Wingo* factors."  *Cantu*, 253 S.W.3d at 280.  These factors include:  (1) the length of the delay, (2) the reason for the delay, (3) assertion of the right, and (4) the prejudice to the accused.  *Id*.; *Barker*, 407 U.S. at 530.  "[T]he greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial."  *Cantu*, 253 S.W.3d at 280–81.  No single factor is determinative, and all factors must be considered together along with relevant circumstances on a case-by-case basis.  *Id*. at 281.

**Standard of Review**

In reviewing the trial court's ruling on Bosworth's "federal constitutional speedy trial claim, we apply a bifurcated standard of review:  an abuse of discretion standard for the factual components, and a de novo standard for the legal components."  *Cantu*, 253 S.W.3d at 282 (citing *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002)).  Review of the *Barker* factors involves both legal and factual determinations, but "[t]he balancing test as a whole . . . is a purely legal question."  *Id*. (citing *Zamorano*, 84 S.W.3d at 648 n.19).  Under an abuse of discretion standard, we defer to the trial court's resolution of facts and reasonable inferences drawn therefrom and review the evidence in a light most favorable to the ruling.  *Id*.

3

**Length of the Delay**

There is no set length of time constituting a presumptively unreasonable delay. *Cantu*, 253 S.W.3d at 281. On the other hand, courts have generally recognized a delay of eight months to be an unreasonable one and one which is adequate to trigger the *Barker* inquiry. *See Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992) (delay of thirteen months from arrest to capital murder trial was prima facie unreasonable under circumstances).[5] Here, the delay of twenty-three months from Bosworth's arrest to trial is a sufficient delay to initiate the *Barker* analysis. *See State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999) (seventeen-month delay from arrest to speedy trial hearing sufficient to trigger *Barker* analysis).

**Reasons for the Delay**

Under *Barker*, "different weights should be assigned to different reasons" which give rise to the delay. *Barker*, 407 U.S. at 531. A "deliberate attempt to delay the trial" should be weighed heavily against the government. *Id.*[6] A "more neutral reason such as negligence or overcrowded courts should be weighed [against the government] less heavily." *Id.* A valid reason for the delay should not be weighed against the government at all. *Id.* When the State offers no reason for the delay, this factor will weigh in favor of a finding of a violation of the right to a speedy trial. *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003). *Dragoo*

---

[5]The complexity of the charged offense should also be considered: "[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531.

[6]Possible examples of a "deliberate intent" to delay trial have been suggested to include a deliberate attempt to delay trial to harm or hamper the accused's defense or to gain tactical advantage over the defendant or to harass him. *See Doggett v. United States*, 505 U.S. 647, 657 (1992); *Barker*, 407 U.S. at 531; *United States v. Marion*, 404 U.S. 307, 325 (1971).

noted, however, that the failure to offer any reason to justify the delay will not necessarily weigh heavily in favor of such a finding. *See id*. When no reason is offered, we may presume that the reason lies somewhere between a deliberate delay and a valid reason that would justify the delay. *See id*.

## Events Between Arrest and Trial

Bosworth was arrested May 10, 2010; an indictment was returned July 30, 2010. Pretrial hearings were held on August 30 and September 30 of that same year. At the September docket call, Bosworth's attorney requested that a mental evaluation be conducted, the State filed a motion for such a mental evaluation on October 6, and the trial court promptly ordered that the examination be performed. At a pretrial hearing on October 25, Bosworth's attorney told the trial court the mental evaluation was to be held within a few days, and counsel requested another pretrial hearing be held after the evaluation results were made known. Acting upon that, the trial court then scheduled another pretrial hearing for November 29, 2010. In the interim, another hearing was held October 29 for the purpose of determining whether the bond should be reduced, at which time the trial court scheduled trial for February 22, 2011. Despite the fact that the bond was halved to $75,000.00, Bosworth remained incarcerated.

The first court-ordered competency examination was conducted November 5, 2010, and the report of that examination was filed with the trial court November 15, 2010. The evaluation failed to address Bosworth's competency to stand trial but opined that he was not insane at the time of the alleged offense. During the examination, Bosworth told examining psychiatrist, Dr. Mitchell Dunn, that Bosworth had previously been diagnosed with schizoaffective disorder

5

and had been treated at mental health/mental retardation clinics in Austin and Houston. Bosworth told the doctor he had previously been treated with Seroquel "but was unable to get that in the jail." Dr. Dunn's report also touched on other elements of Bosworth's mental health such as Bosworth suffering from panic attacks and hearing voices on some occasions when he was particularly stressed, as well as his "significant history of alcohol use," frequent use of marihuana, and "several occasions" of being in alcohol rehabilitation programs. Dr. Dunn opined that Bosworth probably suffered from bipolar disorder.

On December 3, 2010, Bosworth filed the previously-mentioned motion requesting a speedy trial. This motion requested a trial setting on or before February 1 and went on to explain that Bosworth suffered from a "mental disability" and that "[l]engthy incarceration has and will aggravate and agitate his mental condition to the extent he could not effectively communicate with a jury his innocence of the offense."

A hearing (which appears to have initially been scheduled as a final pretrial hearing) was conducted February 22, 2011, the case having been set for trial before a jury the next day. Defense counsel brought up some final pretrial motions, the first of which was a re-urging of a previously-denied motion to permit trial counsel to withdraw. At that hearing, counsel described Bosworth's behavior the previous day when counsel visited him in jail; counsel had not been allowed in the same room with Bosworth because of threats Bosworth had made to his counsel. Counsel described the meeting as follows:

> I attempted to talk with my client through the glass doors. He was in a highly, highly agitated state. I was unable to communicate with him at all. He was yelling, screaming from down the hall all the way up into the room, cursing,

6

throwing insults. Literally, saliva was coming out of his mouth he was so agitated. We could not communicate at all. I had to leave. I did not relay the State's offer to him, the latest plea offer, because of the agitated state. I have relayed that this morning, briefly, along with a letter of various other things. There's various warnings that I've been unable to communicate to my client except in writing. Of course, it's very difficult to get all the information that a client needs to know and put it in writing in an articulate manner. And so we're unable --. He has explained to me that he was in a very bad mood yesterday, woke up, and his threats were off the cuff, were not intended to be real or even heard. He did not understand that the officer had the mic on so he did not mean those threats. And that because they were not, have not been allowing him to have his medication, that he has been in an agitated state.

Bosworth then tried to explain the previous day's incident. It seems he may have been attempting to confirm his attorney's statement that Bosworth had told the attorney that the threats "were not intended to be real or even heard" because Bosworth had not known that the jailers had the microphone engaged. However, in addressing the trial court, after Bosworth said "What they did is, the guy got on the mic. We're in the jailhouse, right?" His explanation then devolved into an expression of his fears of being exposed to a staph infection. Then there was a rapid segue from the expression of his fears of infection to an explanation of the dangers thereof (relating to the trial court that he had been exposed to a staph infection while in Indochina).

THE COURT: Mr. Bosworth --

MR. BOSWORTH: Are you listening to me? I'm trying to tell you something here if you would just --

THE COURT: You need to be quiet.

MR. BOSWORTH: Goddamn, I'm trying to tell the man something and he won't let me tell him. The reason -- what was the question? Oh, the guy got on the mic, sir --

7

THE COURT:  You need to be quiet.  If you're not quiet I'm going to have you removed from the courtroom.

MR. BOSWORTH:  Okay. I'm ready to go anyway.  Check on that (incoherent muttering).  Let's go.

The trial court denied trial counsel's motion to withdraw and took up other motions regarding evidentiary matters, the rule of witnesses, and Bosworth's desire to appear before the jury in civilian clothing rather than those issued for use in the jail.  Throughout these discussions, there are five or six notes in the court reporter's record such as "(incoherent muttering)" attributed to Bosworth, and "(Defendant interrupting)."

Bosworth's trial counsel them summarized the difficulties he had experienced in communicating with Bosworth, referencing the evaluation by Dr. Dunn:

> And I would say that the information that Dr. Dunn received from my client was in much more detail than I've been able to get except in bits and pieces over months [sic] time.  Apparently he was able to communicate with Dr. Dunn to a great deal.  He will not or has not communicated with me to that detail since.  I have discovered this week that my client has been on Seroquel, apparently has been given some medications while he was in jail, have not been giving it to him recently.  And I would inform the Court that periods of time since November, I have been able to communicate with my client to some degree, not to any detail, but to some degree to get the general story.  Mostly by letters and phone calls.  He seemed much more coherent, much more communicative.  However, in the past week, I have been unable to communicate with him at all.  With that history, Your Honor, I would request that either he be put on his medication and we'll see how that goes or that we have him reevaluated for competency.  That is against my client's wishes.

Bosworth said, "No, no, no.  That ain't going.  Forget that.  Forget that." and "No.  We're going to set this for trial."  The court stated he would defer to medical professionals regarding

medications and again instructed Bosworth to be quiet. According to the reporter's record, Bosworth then attempted to leave the courtroom, only to be stopped by deputies.

Defense counsel then put Bosworth on the stand for the purpose of making a record that (1) Bosworth chose to reject a plea offer made by the State, and (2) that counsel had relayed to Bosworth the State's offer to recommend a sentence of five years' incarceration if Bosworth entered a plea of guilty. While Bosworth was on the stand, the following transpired:

> A.  [By Bosworth] Well, I thought about it, and I thought about it, and I thought about it. Damn. That's kind of hard for me to pull. A man like me, man, I could get -- . Sir, mister, --
>
> Q.  [By defense counsel] I'm not asking --
>
> A.  -- if I take three and I get a good deal like that, the way I am, I ain't going to last long in there. Especially with the type of guys I got to live with, see. But that might be all right. But if you're like me, then I'd catch me another charge and I'd be in this deal -- the business I'm in, you know, the six would be worse than twenty. You follow me? But, anyway, what I say is, I thought about the three and I thought about it, and I thought about it, and thought about it. I read the Good Book once and when I started that first verse --
>
> Q.  Mr. Bosworth, do you realize that there is not an offer of three years?
>
> A.  On the table no more?
>
> Q.  There's never been an offer of three years.
>
> A.  I thought he was going to give me three years.
>
> Q.  No. The State offered five years.
>
> A.  Oh, and went down to three?
>
> Q.  No.

9

A. Well, we'll --

Q. You counter-offered with a possibility of --

A. Well, let's take it to trial then. Maybe I could come up with five.

Q. Under the circumstances, Your Honor, could I --

A. You know how to hurt a fellow.

Bosworth's attorney then described to the trial court his attempts to relay the plea offer a couple of days before the hearing, efforts which were compromised by Bosworth's "agitated situation." Counsel described Bosworth's determination to testify at trial despite the attorney's warnings that he could then be questioned about his criminal history and said that Bosworth rejected all plea bargain offers. The attorney also informed the trial court he had contacted three witnesses suggested by Bosworth, and

> [n]one of them are telling what he [Bosworth] anticipates they're going to testify to. They're not telling me what he anticipates. And I've been unable to get any cooperation from my client to, in a coherent fashion. And the way he is today is much the way he usually is with the exception sometimes he's many times worse.

The trial court then noted for the record that defense counsel had related the plea offer to Bosworth, who had "essentially refused to answer the questions posed by defense counsel." Bosworth asked if he could say something, but the trial court declined him permission to do so, prompting Bosworth to respond, "All right. Well, think about that, Judge. It would be the best thing you ever did -- (incoherent)." The court announced that the matter was set for jury selection the next day and recessed the proceedings.

10

The reporter's record resumes later the same morning, with Bosworth not present. The State presented the trial court with new information about Bosworth's medications and how that related to his behavior:

> [Prosecutor]: . . . . [W]e confirmed that they [making reference to the officials with the Gregg County jail where Bosworth was being detained] have not provided him with medication for quite some time. So that is why he's continuing to deteriorate because today he was way over the top. More so than normal. And I think at this point, because of his demeanor, that it's not in our best interest to go forward with it until he at least gets the medication or something in his system. We talked to Judge Burgess [the judge before whom the case would be tried]. He's fine with that. But I just wanted to let you know that it's not going to go to trial tomorrow because he's not been on meds in a few months, at least. Gregg County just took him off.

According to the prosecutor, it was a common procedure for the Gregg County jail officials to take defendants off regular medication until the jail's own physician had examined the defendant. Describing Bosworth's behavior at the hearing earlier in the morning, the prosecutor said, "[H]e's not been on any medication and he was much worse today than he has ever been." Bosworth's attorney commented, "He's always uncooperative. . . . But he's not usually frantic."

Evidently, then, the trial originally scheduled for February 23, 2011, was postponed in order for some determination to be made about the nature of the medications which were needed by Bosworth and to administer those medications in order to moderate his behavior. The unusual circumstances of Bosworth's mental state and the apparent effect the deprivation of his medications had upon his behavior provide some explanation for the delay in trying this case.

However (and quite inexplicably), nothing happened in this case for an additional year: there is nothing in the clerk's record, including no entry on the trial court's docket sheet, until

11

February 10, 2012, when Bosworth filed a motion to set aside the indictment, alleging failure to afford Bosworth his constitutional right to a speedy trial. A hearing was held February 24, 2012, at which a proposed bond reduction was discussed,[7] and the matter was set for trial on April 10.

No further hearings were held until April; but on March 6, 2012, the State filed a motion to have Bosworth examined a second time, this examination eventually having been conducted per court order on March 15 by psychologist Tim F. Branaman. Branaman actually completed two reports, one finding Bosworth competent to stand trial and one finding him not insane at the time of the offense. In both the competency and sanity evaluations, Branaman notes that Bosworth related he was currently being treated with Mellaril (which is described in the competency report as an "antipsychotic medication"). In the sanity evaluation, Branaman related that Bosworth claimed to have been previously diagnosed with schizoaffective disorder and post-traumatic stress disorder (PTSD), but Bosworth was unable to identify where or by whom such diagnoses had supposedly been made. The competency report acknowledges it is not known "to what degree that Mr. Bosworth's functioning has improved" since having been prescribed and receiving this medication. The report states that a determination of the proper dosage and usage should be assessed by a psychiatrist. In the sanity report, Branaman concludes that Bosworth has "a history of mental problems," but there was no indication his alleged behavior in the indicted offense was the "product of a severe mental disease or defect."

---

[7]As mentioned above, on October 29, 2010, Bosworth's bond was reduced to $75,000.00. At the February 24, 2012, hearing, the parties discussed a bond of $20,000.00, but when it was discovered that Bosworth did not have family in Cass County and would be in Austin, the State refused to agree to the reduction. Candidly, however, the prosecutor acknowledged she did not "know when [the State was] going to be able to reach Mr. Bosworth's case."

On April 9, 2012 (the day before jury selection was to begin), a hearing was held on Bosworth's motion to set aside the indictment. As an exhibit, Bosworth's trial attorney presented a letter written by him to the State in June 2011 saying,

> My calls have been ignored. Mr[.] Bosworth is still not on his medication and has deteriorated. Further, he does not have a court setting and has not in months. Please call me at your earliest convenience.

Beneath the typewritten body of the letter was a handwritten notation: "Let's set this matter for trial a.s.a.p." Bosworth testified at the hearing; his testimony will be summarized when we examine his assertion of his speedy trial right below. Generally, Bosworth (in what appears to have included entrances into and exits from fantasy) alluded to purported financial losses he had borne while incarcerated and stated he had consistently wanted a trial in the matter. The State asked no questions of Bosworth and presented no evidence. Ruling the next day, the trial court found the State had given no reason for the delay.

We agree with the trial court that the State offered no explanation for the delay in trying this matter. From the date of arrest, in May 2010, to the February 22, 2011, hearing, was about nine months, slightly more than the eight-month period frequently cited as the general trigger-point for a *Barker* analysis. *See Zamorano*, 84 S.W.3d at 656 (Keller, J., dissenting) (delay of eight months to a year generally considered minimum amount of time to trigger speedy trial analysis); *Knox v. State*, 934 S.W.2d 678, 681 (Tex. Crim. App. 1996) (an eight-month delay generally sufficient to trigger a speedy trial claim). During that period, several pretrial hearings were held, and a mental evaluation was requested and conducted. The case was actually set for trial the day after the February 2011 hearing, but the trial was delayed due to Bosworth's erratic

13

behavior and the discovery that he had not been receiving medications which, all parties seemed to agree, adversely affected his behavior. Bosworth encourages us to hold the State responsible for Bosworth's being denied medication. There is nothing in the record suggesting the State purposefully restricted Bosworth's access to medication. Indeed, from the prosecutor's statement to the trial court, the State was not aware until February 2011 of the situation. On the other hand, in other contexts, "the State" includes far more than just the office of the prosecutor. *Ex parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012). It was certainly one function of the government which was holding Bosworth incarcerated and which assumed the responsibility for his proper medication. There is also no indication the State did anything over the next year to ensure that Bosworth received any necessary medication.[8] Where there is no reason offered for the delay, this factor is weighed against the State. *Barker*, 407 U.S. at 531; *see also Zamorano*, 84 S.W.3d at 650.

We also point out this was not a complex case for the State to prove. When the trial was eventually conducted, the guilt/innocence phase of the trial consumed only one day with the State presenting five witnesses and Bosworth four. As quoted above, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531; *see also Zamorano*, 84 S.W.3d at 650 (charged driving while

---

[8]*Barker* pointed out that a "neutral reason" for delay, such as "overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531. It is not then unreasonable to lay responsibility at the State's feet, when circumstances suggest, to make further inquiry whether an inmate is in need of medical treatment, including medical treatment needed for psychological or mental symptoms.

14

intoxicated offense "not a complex case"). We weigh the reasons for delay factor against the State.

**Assertion of Right to Speedy Trial**

Although it is the primary burden of the government to bring an accused to trial, the defendant does bear the responsibility of asserting his right to a speedy trial. *Barker*, 407 U.S. at 529–30. An accused's failure to assert that right will make it difficult to prove he was denied a speedy trial. *Id.* at 532; *see also Dragoo*, 96 S.W.3d at 314 (failure to timely demand speedy trial strongly suggests defendant did not really want trial and suffered no prejudice by not having one). "Repeated requests for a speedy trial weigh heavily in favor of the defendant, while the failure to make such requests supports an inference that the defendant does not really want a trial, he wants only a dismissal." *Cantu*, 253 S.W.3d at 283 (citing *Barker*, 407 U.S. at 534–36).

Bosworth filed a motion for speedy trial on December 3, 2010, in which he claimed he would

> be prejudiced should trial not be held on or before 2-1-2010,[9] for the reason that He [sic] is being held in jail without a forseeable trial date. He has a mental disability. Lengthy incarceration has and will aggravate and agitate his mental condition to the extent he could not effectively communicate with a jury his innocence of the offense.

It is significant that in that motion, Bosworth did not request that his case be dismissed; rather, the motion was genuinely an assertion of his right to a speedy trial, not an attempt to extricate himself from the responsibility of being tried. After that motion, as discussed above, the matter was set for trial in February 2011, but the trial was delayed after the State announced the

---

[9]Again, we will treat this as a typographical error and assume Bosworth meant February 1, 2011.

discovery that Bosworth was not receiving medication. After that hearing, there appears to have been no further hearings or other court activity in the case until February 2012. It was during this year-long period of inactivity that Bosworth's attorney sent the June 2011 letter to the State (quoted above), in which he complained that defense counsel's calls had not been returned, that Bosworth was still not receiving medication for his mental problems, and that a trial date had not yet been set. The letter included a request for a trial setting "a.s.a.p."

On February 10, 2012, Bosworth's attorney filed a motion with the trial court which (for the first time) included a request to set aside the indictment, citing deprivation of a speedy trial. The motion claimed there were no satisfactory reasons for the delay and went on to relate that Bosworth had "suffered oppressive pretrial incarceration," "substantial anxiety and concern," and been "systematically denied prescribed medicine which has effected [sic] his ability to handle the stress and other medical treatment and has suffered severe financial loss due to thefts from his bank account."

In addition to the actions of his defense counsel, on several occasions at various pretrial hearings in 2010, Bosworth himself made in-court comments evincing his desire to be brought to trial as soon as possible. For example, on October 29, 2010, during discussions about an agreement to lower Bosworth's bond, Bosworth's attorney chastised Bosworth, "Now is not the time to talk." Bosworth replied, "Yeah, it is. I keep telling you to file for a speedy trial and I want an affidavit of prosecution -- ." On November 29, 2010, Bosworth told the trial court that "when we come to court, sir, on the 22nd, I don't want no continuancies [sic]." He further complained, "I've been in jail ten months on a fraudulent charge, but I was the victim, sir. Since

16

then, my whole world has fell [sic] apart. I've got people out there writing checks on me right now, stealing my money."[10] This comment was followed during the same hearing by a statement from the trial court that Bosworth's matter was set for a docket call on January 6, 2011, at which time a trial date would then be assigned. Bosworth personally reminded the trial court he had already set a trial date: "I thought we already got trial set, Your Honor, for February 22. Are you speeding it up for me? I mean, I need to know, Your Honor. Now, if you'd speed it up, that'd be great for me." At the February 2011 hearing, when the medication issue was discovered and the next day's trial was postponed, Bosworth twice stated his desire to proceed to trial. The day before trial finally began, in April 2012, at the speedy trial hearing, Bosworth said he had "been trying to get a trial for the last year" and complained to the trial court, "We've had seven set-offs, your Honor."

The State argues that Bosworth essentially waived his speedy trial claim based on the following actions: (1) the defense requested a mental evaluation on September 30, 2010, (2) on October 25, 2010 (before the competency exam had been conducted), Bosworth's defense counsel requested that a pretrial hearing be conducted after the competency results were submitted, resulting in the conduct of such a hearing November 29, 2010, (3) at the February 22, 2011, hearing, defense counsel said, "I would request that either he be put on his medication and we'll see how that goes or that we have him reevaluated for competency." We do not find that these actions contributed to the delay such that the delay could be deemed "attributable to the defendant." *Barker*, 407 U.S. at 529. As directed by the United States Supreme Court, we

---

[10]At the speedy trial hearing, on the eve of trial, Bosworth testified a person was living in his home and writing checks on Bosworth's account.

17

weigh the conduct of both the prosecution and the defense. We find that Bosworth adequately asserted his right to a speedy trial; this factor weighs in Bosworth's favor.

**Prejudice**

The final *Barker* factor examines whether and to what extent the delay has prejudiced the defendant. When a court analyzes the prejudice to the defendant, it must do so in light of the defendant's interests that the speedy-trial right was designed to protect: (1) to prevent oppressive pretrial incarceration, (2) to minimize the accused's anxiety and concern, and (3) to limit the possibility that the accused's defense will be impaired. Of these types of prejudice, the last is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Cantu*, 253 S.W.3d at 285 (footnote omitted).

Bosworth was incarcerated for twenty-three months awaiting trial. There is evidence, in the form of the mental evaluations and to some extent Bosworth's conduct in the various hearings and at trial, that he was in need of some form of medication for the purpose of either aiding him to moderate his behavior or, even, perhaps, to treat a mental disorder from which he suffered. In *Munoz*, the Texas Court of Criminal Appeals found "dispositive" of the oppressive pretrial incarceration subfactor the fact that Munoz "was incarcerated during the entire seventeen-month delay." 991 S.W.2d at 828. Likewise, we find the record establishes Bosworth was subjected to oppressive pretrial incarceration.

Regarding the subfactor of anxiety or concern to the defendant, Bosworth testified that he believed his incarceration had caused financial loss; he said he had lost "$10,000 worth of

18

checks," which he seemed to claim were being cashed or stolen by a person living in his home.

He also seemed to characterize this squatter as a potential trial witness:

> A.      No.  I've got a witness -- the witness I want to locate is a dude named Ralph Cecil Koran (phonetic).  Do you know him?  I've been reading about him in the paper.
>
> Q.      Okay.
>
> A.      He's living on my property, and it's supposed to be Max --
>
> Q.      All right.
>
> A.      -- is my understanding --
>
> Q.      Let's keep to the point, Mr. Bosworth.  Let's keep it to this question I asked.
>
> A.      You asked me about this man.  His name is Cecil Kinar (phonetic).  I've got his check right here.  I read about him in the paper.  He's living on my property and spending my money --
>
> Q.      And --
>
> A.      -- while I'm in here.
>
> Q.      You've been locked up all this time.  Has it -- has your memory deteriorated?  Has your condition deteriorated because of being locked up?
>
> A.      My -- the way my mind thinks, for sure it has.  You try being incarcerated and being -- I'm in segregation right now.  You understand?  I have to fight to make my way in there, and I'm getting kind of old.

While this testimony is somewhat rambling, and the trial court was in the best position to evaluate Bosworth's credibility on the stand, it is some evidence of Bosworth's anxiety or

19

concern.[11]   Bosworth alluded to this worry or fear of money being taken in November 2010

when he said he had "people out there writing checks on me right now, stealing my money."[12]

Whether Bosworth's concern was attributable to actual circumstances or if it was simply a

figment of his imagination does not diminish the fact that he believed his incarceration to be a

factor in losses he perceived himself to be enduring.  Additionally, there is some evidence of

anxiety suffered by Bosworth in the nature of his testimony and conduct throughout the history

of the case.  In the passage above, he describes being held in segregation and having to fight

others while in jail; during the November 29, 2010, hearing, Bosworth said that his "whole world

has fell apart" since his incarceration on what he claimed was a "fraudulent charge."  This is not

to say we conclude Bosworth proved he was losing money or was being robbed. Rather,

irrespective of the accuracy of his thoughts as revealed by his testimony, it is plain that Bosworth

was suffering anxiety or concern as a result of his incarceration and that anxiety or concern was

likely to have been exacerbated by extended periods when he was not receiving medications

which had been prescribed for the purpose of somehow ameliorating (to some degree or the

other) his mental illness.

---

[11]This testimony can be compared with that of the defendant in *Zamorano*, who testified about a specific amount of wages he lost each time he had to miss work for pretrial appearances. *Zamorano*, 84 S.W.3d at 654. *Zamorano* contrasts with *Cantu*, where the appellant did not lose his job or suffer disruption of his work schedule and only suffered minor inconveniences with regard to checking in with his bondsman. *Cantu*, 253 S.W.3d at 286.

[12]In the same hearing, Bosworth also complained his attorney would not bring up a matter of concern to Bosworth: "I don't think he'll ever bring it up, five thousand dollars worth of hot checks out there -- I mean forgery checks. Far as I know, they could have been stolen.  I was robbed that day."  Bosworth's defensive theory was that he was robbed the day of the alleged indecency by exposure and that the robbers were his accusers in the indecency case. However, when Bosworth testified at trial, he acknowledged the witnesses who had testified against him were not the people who he claimed robbed him.

Of the three interests the speedy trial right is designed to protect, the subfactor of limiting the possibility that the accused's defense will be impaired is perceived as the most serious because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Dragoo*, 96 S.W.3d at 315 (quoting *Barker*, 407 U.S. at 532). It is not required that a speedy trial claimant show specific, actual prejudice. "[C]onsideration of prejudice is not limited to the specifically demonstrable . . . . [A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655. *Doggett* noted that "*Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Id.* (quoting *Barker*, 407 U.S. at 532). *Doggett* went on to "recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria[,] . . . it is part of the mix of relevant facts, and its importance increases with the length of delay." *Id.* at 655–56. In *Doggett*, eight and one-half years passed from indictment to arrest. *Id.* at 649–50. Obviously, that delay was significantly more "excessive" than that at issue here.

The defensive theory Bosworth presented was that he had been robbed by a group of young men at Bosworth's campsite. The State's evidence was that a fourteen-year-old girl, camping with her family at a local lake, saw Bosworth expose and fondle his penis while talking to and smiling at the girl. Bosworth told his defense counsel that his defense was based on a contention that he was robbed by the people who made the allegations that were the substance of

21

the indictment. On one occasion at a pretrial hearing, Bosworth said he did not think the State's witnesses would appear at trial. At another hearing, his attorney said he had contacted witnesses suggested by Bosworth but that those witnesses were not going to provide the kind of testimony anticipated by Bosworth. At trial, Bosworth took the stand and testified that the State's witnesses who described the charged offense were not the people who robbed him.

It is difficult to see how, based on the defense Bosworth presented, it could be said such defense was impaired by the delay in getting the case to trial.[13]

At the hearing on the speedy trial motion, the day before voir dire was held (April 9, 2012), Bosworth gave the testimony quoted above about someone living on his property and cashing his checks. Bosworth also tried to admonish the trial court about his understanding of Texas criminal procedure, claiming that the prosecutor could not negotiate a plea bargain under the circumstances and that "25 of the penal code. . . . states a defendant can take a lie detector test in a court of law to prove his innocence. Article 1, Section 10 of the Bill of Rights of the State of Texas confirms that." Later, the trial court explained the next day's voir dire proceedings, to which Bosworth commented, "I can see already we're going to have a problem picking . . . jury because I've been studying the way you handle your court."

_____

[13]It is worth noting that Bosworth's attorney twice (in November 2010 and February 2011) moved to withdraw from the case, describing difficulties he had experienced in communicating with Bosworth. The first time counsel sought to withdraw, he said the motion was made at Bosworth's request. When Bosworth addressed the court, he claimed there was a conflict of interest on the part of his appointed counsel. Bosworth also described what apparently was part of his defensive theory or understanding of the law when he told the trial court, "[Y]ou do know that the district attorney and the prosecution has got to get ahold of this child's mother in order for us to do anything -- anything by law." At the February 22, 2011, hearing, counsel filed a second motion to withdraw, or alternatively asked the trial court to reconsider his earlier motion. Counsel again described difficulties communicating with Bosworth and said Bosworth had filed a grievance against him with the State Bar of Texas. Counsel went on to describe Bosworth's agitated, disruptive, threatening behavior quoted above.

These are not necessarily examples of the delay impairing Bosworth's ability to present a defense, but in the totality of the record, they are evidence of Bosworth's erratic, bizarre behavior. At oral argument, Bosworth's appellate counsel surmised that, taken as a whole, the behavior of Bosworth in court proceedings over the course of the twenty-three months appeared to show that Bosworth became increasingly unstable as time passed. Although there is no expert evidence to support the contention that the instability increased with the passage of time, a consistent pattern of behavior by Bosworth in court ratifies that he was in need of medication. Since, however, there is nothing concrete in the record to support a firm conclusion that the circumstances of his extended incarceration necessarily impaired his ability to present a defense, this subfactor weighs against a finding of prejudice.[14]

## Balancing the *Barker* Factors

We balance the relative weights of each of the above factors in light of "the conduct of both the prosecution and the defendant." *Barker*, 407 U.S. at 530. The factors are related and must be considered together, along with any other relevant circumstances. *Id*. at 533. None of the factors have "talismanic qualities" and "courts must . . . engage in a difficult and sensitive

---

[14]In most of the cases we have reviewed, the allegation of prejudice focuses on claims of lost witnesses or faded memory. But such claims, which go to impairment of defense, are not required to show prejudice. In *Zamorano*, the finding of prejudice was based on the evidence of financial cost, disruption of employment, and the length of the delay, which "support[ed] an inference of actual prejudice." *Zamorano*, 84 S.W.3d at 654. The lack of particular evidence of impairment of Zamorano's ability to present potential defenses did "not doom his claim." *Id.* at 652 n.49. In *Stock v. State*, prejudice was shown where the defendant was incarcerated for one year before trial, there was unrebutted testimony that the delay substantially interfered with Stock's employment prospects, and he was subjected to burdensome economic costs and travel requirements for trial settings and urinalyses; there was no discussion of impairment to his ability to present a defense. *Stock v. State*, 214 S.W.3d 761, 766–67 (Tex. App.—Austin 2007, no pet.).

balancing process." *Id.* The balancing test is a "purely legal question," reviewed de novo. *Johnson v. State*, 954 S.W.2d 770, 771 (Tex. Crim. App. 1997)

The trial court found that the State gave no reason for the delay and that Bosworth asserted his right to a speedy trial. As explained above, we reach the same conclusions on those two factors. However, the trial court found Bosworth did not make an adequate showing of prejudice, which is where our analysis diverges from that of the trial court. The trial court found that while the delay in the instant case "borders on excessive, it doesn't rise to the level of any kind of prejudice or impairment of the fairness of the case." With this explanation, the trial court denied Bosworth's motion to dismiss on speedy trial grounds.

The delay of twenty-three months was presumptively unreasonable, and no justifiable reason was presented for the delay. These factors weigh in favor of finding a violation of Bosworth's right to a speedy trial—the clock ticks slower for one incarcerated. Bosworth asserted his right to a speedy trial, as evidenced by his motions (one specifically requesting a speedy trial, then a second one requesting dismissal of the charge fourteen months later), his letter to the prosecutor, and various statements by Bosworth himself to the trial court. This factor also weighs in favor of a finding of a violation. As for prejudice, we find the record shows Bosworth suffered oppressive pretrial incarceration. There was some evidence of anxiety or concern on his part, as shown by his testimony and from the overall tenor of his behavior and the record, indicating he likely was deprived, for a substantial time, of medications for psychological

24

problems.[15] These subfactors weigh in favor of a finding of a violation. None of the *Barker* factors are individually determinative. We consider all factors together, along with the relevant circumstances, on a case-by-case basis. *Cantu*, 253 S.W.3d at 280–81. A speedy trial movant does not have to show actual prejudice. A showing of some prejudice will suffice. *Courtney v. State*, 472 S.W.2d 151, 154 (Tex. Crim. App. 1971). We find that some prejudice was shown under the circumstances of this case. "When a defendant makes a 'prima facie showing of prejudice,' the State carries 'the obligation of proving that the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay.'" *Munoz*, 991 S.W.2d at 826 (citing *Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973)).[16] A failure by the accused to show that the conduct of his trial was damaged by such a delay does not entirely negate the other *Barker* factors which go into the evaluation or render them worthy of no consideration.

We find the *Barker* factors in the instant case weigh in favor of Bosworth, and we find that his right to a speedy trial was violated.

---

[15]The prosecutor said, in February 2011, he had not had his medications "for quite some time[.]" From the context of her statement, it is very possible Bosworth had not had the medications since his May 2010 arrest. Defense counsel's June 2011 letter to the State said Bosworth was still not receiving medications and had "deteriorated." In March 2012, in the second psychological examination, and in April 2012 at the speedy trial hearing, Bosworth said he was receiving Mellaril in the jail. It is reasonable to infer Bosworth was without medications from at least January or February 2011—if not May 2010—until sometime in the second half of 2011, if not longer.

[16]Consider also:

> [E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, . . . it is part of the mix of relevant facts, and its importance increases with the length of delay.

*Doggett*, 505 U.S. at 655–56 (citation omitted).

25

We reverse Bosworth's conviction and render a judgment of acquittal.


Bailey C. Moseley
Justice

Date Submitted:     January 23, 2013
Date Decided:       February 15, 2013

Publish