

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00125-CR

_____

MICKY DON WADE, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 59,642-C

---

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellant Micky Don Wade[1] appeals from his conviction on five counts of sexual assault of a fourteen-year-old girl, E.B.[2] Wade, who had previously been convicted of indecency with a child, received five life sentences, which the trial court ordered to run consecutively. Each count was based on Wade's actions during one encounter. Wade was represented by appointed counsel at trial, but he filed multiple pro se motions alleging speedy-trial violations and, in at least one motion, a conflict of interest with his attorney. On appeal, represented by appointed appellate counsel,[3] Wade argues in five issues that he was denied a speedy trial; that counts three and four were barred by the Double Jeopardy Clause in the United States Constitution; that count 5 was also barred by double jeopardy; that he was denied the constitutional right to a judicial determination of his pro se motion alleging a conflict of interest with his attorney; and that he was constructively denied counsel because his attorney failed to subject the prosecution's case at punishment to meaningful adversarial testing. We will affirm.

---

[1]Some of the trial court documents, including the indictment, spelled Wade's name as "Micky Dawn Wade." However, because the trial court's judgment spelled his name as "Micky Don Wade," we use that spelling.

[2]We use an alias to refer to the child. *See* Tex. R. App. P. 9.8(b)(2).

[3]Wade has filed pro se documents with this court.

## Background

### I. The charges against Wade

Wade was charged by indictment with intentionally or knowingly causing

- "the penetration of the mouth of [E.B.], a child who was then and there younger than 17 years of age, by the defendant's sexual organ" (count 1);

- "the penetration of the sexual organ of [E.B.] . . . by defendant's sexual organ" (count 2);

- "the penetration of the sexual organ of [E.B.] . . . by the defendant's finger" (count 3);

- "the penetration of the mouth of [E.B.] . . . by the defendant's sexual organ" (count 4); and

- "the sexual organ of [E.B.] . . . to contact the sexual organ of the defendant" (count 5).

The State also filed a notice of intent to introduce extraneous offenses as well as a "Notice of Enhancement with Prior Indecency with a Child Conviction" alleging that Wade had previously been convicted of indecency with a child. In a pre-trial hearing and at trial, the parties stipulated that Wade was the same person who had been convicted in the prior indecency-with-a-child case.

### II. Wade's pretrial motions

Wade was arrested on January 8, 2018, and indicted on February 5, 2018. In March, a different trial court terminated Wade's parental rights to one of his children. At the end of June, his first appointed attorney in this case withdrew, and a new attorney was appointed. Despite the new attorney's appointment, Wade began filing multiple

pro se motions, including a November 30, 2018 habeas petition asserting, among other matters, his right to a speedy trial. He also complained in the petition that his appointed attorney was ineffective and had a conflict of interest because the attorney "represents Marcos M. Rodriguez[,][4] who is mentioned in the Discovery Material as a potential witness for the State."

In January 2019, Wade's parental rights to his other child with his ex-wife were terminated. Through 2019, he filed several other documents in this case asserting his speedy trial right, including an August 2019 "Motion to Dismissal [sic] Indictments" based on the alleged violation of his speedy-trial right. The record does not reflect that the trial court read or ruled on this motion.

On September 12, 2019, the trial court held a hearing on Wade's assertion of his speedy-trial right. At that hearing, the trial court set the case for trial on March 23, 2020, which was the court's next available special setting. A few days later, Wade filed a habeas corpus petition, which he had signed on September 12, after the hearing. In that petition, he again asked for dismissal. He contended that the case had originally been set for trial the previous month, on August 19, 2019; that the prosecutor stated at the September hearing that trial could not go forward on that date because of a CPS case[5];

---

[4]The document did not explain who Rodriguez was, but according to an affidavit later executed by Wade and read by him to the jury, Rodriguez was his friend and former roommate.

[5]In the September 12, 2019 hearing, the prosecutor did not say that trial had not gone forward because of a CPS date. Wade asserted that he "was under the assumption

4

and that "[i]f the State wanted to prosecute[,] then it would ha[ve] honored th[at] trial date." Nothing in the record indicates that the trial court saw the petition.

On March 11, 2020—about a week and a half before the scheduled trial date—Wade's attorney filed a motion for continuance on the ground that the attorney had a scheduling conflict "due to his chemo treatments being scheduled." The trial court granted the motion.

Also in March 2020, Wade filed another pro se motion to dismiss all charges for speedy trial violations. In that motion, he recognized that because of COVID-19 precautions, "[o]n March 16, 2020[,] the Wichita County officials [had] canceled all jury trials, not to resume until at least May 2020." In June 2020, Wade filed a "Motion to Set a Hearing," seeking a hearing on his pro se filings. In that document, he complained that the continuance had been granted without his presence or knowledge and was not an agreed continuance under Code of Criminal Procedure Article 29.02.[6]

---

by my attorney that trial was to be on August 19th." The prosecutor then told the court, "On August 19th—right now, I am not sure why it didn't go to trial here. I was actually in trial in the 78th [District Court] on the 19th all week long. I believe [the trial court] w[as] trying something here as well." The prosecutor mentioned Wade's termination case only after Wade complained that he had already been through two termination trials. The prosecutor responded that termination cases are expedited and "are always tried much quicker than criminal cases."

[6]We assume from this motion that Wade believed that the trial court should have required the attorney to forego his cancer treatment, because the only other two options—allow Wade to proceed pro se or appoint another attorney—would have caused a delay so that Wade or the attorney could prepare for trial.

5

*See* Tex. Code Crim. Proc. Ann. art. 29.02. In July, he filed a similar "Petition for Trial Court's Response" asking for the trial court to rule on his motion to set aside the indictments, again asserting that he had not agreed to a continuance, and seeking a discharge under Code of Criminal Procedure Article 28.061. *See id.* art. 28.061 ("If a motion to set aside an indictment, information, or complaint for failure to provide a speedy trial is sustained, the court shall discharge the defendant."). He filed another habeas petition in August 2020 based on multiple alleged constitutional violations, including the right to a speedy trial. Throughout this time, he also filed multiple pro se motions related to discovery and procedural matters.

The State filed a response to Wade's pro se filings, asserting that the trial court could disregard the documents because Wade was represented by counsel. The trial court then signed an order in which it "decline[d] to consider the merits of any of [Wade]'s pro se filings or to take any action with respect to them." After that, Wade continued to submit pro se documents, including an October 2020 habeas petition seeking dismissal of the indictments for failure to provide a speedy trial and a July 2021 habeas petition asserting, among other grounds, a speedy trial violation.

## III. Offense testimony

The case proceeded to trial in August 2021. E.B., who by that time had turned eighteen years old, testified. She told the jury that through a mutual friend, she and Wade had become Facebook friends and had exchanged messages and that one day when she was fourteen and needed a ride home from a friend's house, she asked Wade

6

for a ride. Despite her asking him to drive her home, he drove her to an alley behind a house on which he had done construction work. She then testified about multiple acts of sexual assault against her by Wade that occurred in his truck.[7] Afterward, Wade bought her some food at McDonald's, gave her $20, and drove her home.

Other witnesses for the State included B.C., who testified that Wade had sexually assaulted her nearly twenty years before when he was nineteen and she was twelve; Raymond Perry, a police officer working for the Office of Inspector General, Texas Health and Human Services, who investigated the case involving E.B after receiving information about it from a third party; Chase McConnell, the police detective who arranged for a forensic interview of E.B. and who conducted the photo lineup in which E.B. identified Wade as the man who had assaulted her; and M.G., a teenage relative of Wade's, who testified that Wade had told him about the encounter with E.B.

## IV. Wade's Desire for Self-Representation and Wade's Testimony

After the State rested, Wade informed his attorney that he wanted to represent himself, prompting the trial court to hold a *Faretta* hearing. *See Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct 2525, 2541 (1975) (requiring a court to ensure that an accused who wants to manage his or her own defense understands the dangers and disadvantages of self-representation). Wade stated that he had become concerned that

---

[7]We set out her testimony in greater detail below when addressing Wade's issues asserting double jeopardy violations.

7

his attorney "did not want to call the defense that [he] wanted to represent for [him]self." His attorney was sworn in and testified that because Wade had filed so many pro se motions, he had previously asked Wade if Wade wanted to represent himself, and Wade had "expressed a desire for me to represent him. We had talked about that on several occasions." The State objected to Wade's request for self-representation as untimely, and the trial court denied the request on that basis.

Wade then testified in his own defense against his attorney's advice. He acknowledged that he was a registered sex offender, but he told the jury about his belief that E.B. had lied about what happened with him and that she did so in an attempt to help his ex-wife gain custody of her and Wade's children.

## V. Verdict and Sentencing

The jury found Wade guilty on all five counts. The trial court found the enhancement allegation true and sentenced Wade to life confinement on each count, with the sentences to run consecutively.[8] Wade's attorney filed a motion for new trial, and Wade filed two pro se new-trial motions. The motions were overruled by operation of law, and Wade now appeals.

---

[8]Wade's previous conviction for indecency with a child dictated that he receive confinement for life as punishment for a subsequent sexual assault offense. *See* Tex. Pen. Code Ann. § 12.42 (stating that if a defendant is convicted of sexual assault under Penal Code Section 22.011 after previously having been convicted of indecency with a child under Penal Code Section 21.11, the defendant must be punished for the sexual assault offense with life imprisonment). Thus, the only issue at punishment was whether the trial court should order his sentences to run consecutively or concurrently.

8

## Discussion

## I. Speedy Trial (Issue One)

In Wade's first issue, he argues that COVID-19 and its impact do not displace a defendant's constitutional right to a speedy trial, that he timely and persistently requested a speedy trial but was nevertheless continuously imprisoned for over two years before the pandemic hit and for over three and a half years total before trial finally began, and that he was therefore denied a speedy trial. The State maintains that the speedy-trial factors articulated in *Barker v. Wingo*, 407 U.S. 514, 529 (1972), foreclose Wade's request for dismissal of the charges. We agree with the State.

### A. Standard of Review and the *Barker* Factors

Under *Barker*, courts determining whether a defendant's Sixth Amendment right to a speedy trial has been violated must balance four factors: the length of delay, the reasons for delay, to what extent the defendant asserted his or her right, and any prejudice suffered by the defendant. *Balderas v. State*, 517 S.W.3d 756, 767 (Tex. Crim. App. 2016). In our analysis of these factors, we apply an abuse of discretion standard for the factual components, giving "almost total deference to historical findings of fact of the trial court that the record supports and draw[ing] reasonable inferences from those facts necessary to support the trial court's findings." *Gonzales v. State*, 435 S.W.3d 801, 808–09 (Tex. Crim. App. 2014); *see also State v. Lopez*, 631 S.W.3d 107, 113–14 (Tex. Crim. App. 2021) (citing *State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999)). We review de novo "whether there was sufficient presumptive prejudice to proceed to

9

a *Barker* analysis and the weighing of the *Barker* factors, which are legal questions." *Gonzales*, 435 S.W.3d at 809. However, "while an evaluation of the *Barker* factors includes fact determinations and legal conclusions, 'the balancing test as a whole is a purely legal question that we review de novo.'" *Lopez*, 631 S.W.3d at 114 (quoting *Balderas*, 517 S.W.3d at 767–68).

## B. Analysis

### 1. Length of Delay

To calculate the delay length, we measure from the time that the accused is arrested or formally accused. *Gonzales*, 435 S.W.3d at 809. The length of delay has relevance to two different parts of a speedy-trial analysis. First, no analysis of the other *Barker* factors is required unless the delay is long enough to merit further inquiry: "by definition, [a defendant] cannot complain that the government has denied him [or her] a 'speedy' trial if it has, in fact, prosecuted his [or her] case with customary promptness." *Doggett v. United States*, 505 U.S. 647, 651–52, 112 S. Ct. 2686, 2690–91 (1992); *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017). "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002) (holding that two-year-and-ten-month delay was sufficiently lengthy to trigger analysis in ordinary driving-while-intoxicated case). For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy case." *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192.

Second, if a full *Barker*-factor analysis is required, the length of delay is relevant in determining the prejudice factor. A delay of sufficient length results in presumed prejudice, meaning that this factor will weigh heavily in the defendant's favor unless the prejudice is negated by the State or mitigated by the defendant's acquiescence in the delay. *Doggett*, 505 U.S. at 655–56, 112 S. Ct. at 2693; *Gonzales*, 435 S.W.3d at 815; *cf. Barker*, 407 U.S. at 535, 92 S. Ct. at 2194 (noting that "the record strongly suggests that while [the defendant] hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried"). "[T]he presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652, 112 S. Ct. at 2691. When a delay long enough to result in presumed prejudice has been caused by the State's negligence, and the defendant has timely asserted the right to a speedy trial, the defendant will generally be entitled to relief. *Gonzales*, 435 S.W.3d at 815.

Thus, considering the length of delay is a double inquiry requiring calculation of the length of delay and determination of whether that delay is long enough to trigger an examination of the other *Barker* factors and to presume prejudice. *Doggett*, 505 U.S. at 651, 112 S. Ct. at 2690. A delay of one year has generally been held sufficient to trigger a full *Barker*-factor analysis, *see Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003), and a delay of five years has been held sufficient to relieve a defendant of the need to prove the prejudice factor, *see Voda v. State*, 545 S.W.3d 734, 744 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

The State contends that seventeen months of the delay between Wade's arrest and trial was justified—an argument we address in the next section—but it concedes that the period of unjustified delay was nevertheless long enough to trigger further analysis. We agree that a full analysis is required. *See Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008) (holding that seventeen-month delay is long enough to trigger analysis of all *Barker* factors). This factor therefore weighs against the State. *See Gonzales*, 435 S.W.3d at 809; *Shaw*, 117 S.W.3d at 889.

### 2. The Reasons for the Delay

The State has the burden of justifying the length of delay. *Cantu*, 253 S.W.3d at 280. Reasons for delay may weigh against the State, weigh against the defendant, or justify the delay:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531, 92 S. Ct. at 2192; *see Hopper*, 520 S.W.3d at 924; *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003). "Unjustifiable reasons for delay count towards the 'length of delay,' while justifiable reasons for delay do not," and, as with the triggering point for a full-*Barker* analysis, a justifiable reason for delay in a complex case may not be a justifiable reason in a simple case. *Gonzales*, 435 S.W.3d at 810. Here,

12

there were two distinct periods of delay—before and after the initial trial setting—with different justifications provided.

### a. January 8, 2018–March 2020

Wade was arrested in January 2018. We do not hold the first three months after the arrest against the State because the State is allowed a reasonable period to prepare its case. *See Shaw*, 117 S.W.3d at 889–90 (holding that three-month interval between appellant's indictment and first trial could not be counted against the State since the State was entitled to a reasonable period in which to prepare its case); *State v. Echols*, No. 11-19-00209-CR, 2021 WL 2174148, at *4 (Tex. App.—Eastland May 28, 2021, pet. ref'd) (mem. op., not designated for publication) (concluding that approximately seven months of time attributable to the State's preparation for trial in aggravated sexual assault of a child case should not be held against the State); *Callender v. State*, No. 07-13-00069-CR, 2013 WL 6908953, at *2 (Tex. App.—Amarillo Dec. 12, 2013, no pet.) (mem. op., not designated for publication) ("The wheels of justice must be afforded a reasonable amount of time to turn."). For the remaining months until the first trial setting, the State provided some explanation. At a September 2019 hearing on Wade's initial pro se speedy-trial motion,[9] the prosecutor explained that Wade had "pro se'ed

---

[9]Wade's attorney was present at the hearing and asked Wade to present the motions to the court "since he's the one [who] filed it."

13

us to death"[10] by filing motions for relief "he's not entitled to," such as copies of discovery. Wade's first appointed attorney had been allowed to withdraw[11] based on a conflict of interest at the end of June 2018, and, although a new attorney had been appointed in the withdrawal order, Wade nevertheless began filing his own pro se motions, including motions seeking discovery, as the State pointed out. However, other than the speedy trial motion, no hearing was held on the motions, and the State did not file responses to them. Thus, on this record, we cannot say that Wade's pro se filings contributed to the delay.

The prosecutor further stated, however, that the State had done its best to expedite the trial, but it was facing a crowded docket, and the trial court "ha[d] a bunch of special settings already," including a murder trial and an aggravated sexual assault case in the following month. The trial court agreed to set the case for trial at its next available special setting on March 23, 2020. An explanation based on heavy caseload or crowded dockets weighs against the State, but not heavily. *See Munoz*, 991 S.W.2d at 822; *Black v. State*, No. 02-21-00057-CR, 2022 WL 3464563, at *7 (Tex. App.—Fort

---

[10]Wade filed two interlocutory appeals while waiting for trial. If those appeals had delayed trial, the delay attributable to those appeals would not have counted in support of his speedy-trial claim. *See United States v. Loud Hawk*, 474 U.S. 302, 316, 106 S. Ct. 648, 657 (1986). However, the appeals did not cause delay because they were filed and disposed of during the time that trials were not being held in Wichita County due to COVID-19.

[11]The first appointed attorney worked for the public defender's office, and she asserted that the office had a confidential conflict of interest.

14

Worth Aug. 18, 2022, no pet.) (mem. op., not designated for publication). However, because this excuse does not justify the delay, we include the period from April 2018 to mid-March 2020 in calculating the length of delay.

### b. March 2020–August 2021

The next period of delay had two causes: a continuance and the COVID-19 pandemic. As noted, approximately two weeks before the March 23, 2020 trial date, Wade's attorney moved to continue the trial due to his cancer treatments, and the trial court granted the request.

Several months later, in a pro se "Motion to Set a Hearing," Wade objected to the continuance motion's granting, which he stated was "done without [his] presence or knowledge for rebuttal, as it is not agreed upon under Texas Code of Criminal Procedure Article 29.02 by the Defendant. For there is no continuance under the Speedy Trial Act." *See* Tex. Code Crim Proc. Ann. arts. 29.02 (allowing for agreed continuances). On appeal, Wade argues that under *Orellana v. State*, the delay caused by the granting of the continuance cannot be held against him because he disavowed the continuance motion filed by his attorney. *See* 706 S.W.2d 660, 661 (Tex. Crim. App. 1986).

In *Orellana*, the Court of Criminal Appeals held that for purposes of Texas's speedy trial act, the delay caused by an agreed reset should not be counted in calculating the time period between arrest and trial because nothing in the record indicated that the defendant's attorney lacked authority to sign the reset forms. *Id.* Wade relies on this

15

case to argue that because he made an after-the-fact objection to the continuance, the continuance should not be held against him.

Wade's motion did not, however, provide evidence that at the time that his attorney requested and obtained the continuance, the attorney was acting without authority. Wade's motion states that he was not informed or consulted about the motion ahead of time, but it is not evidence the attorney was not authorized to request it or agree to its granting at the time that the attorney did so. *See Vermont v. Brillon*, 556 U.S. 81, 90–91, 129 S. Ct. 1283, 1290–91 (2009); *cf. United States v. Clark*, 577 F.3d 273, 283 (5th Cir. 2009) (reviewing dismissal of indictment without prejudice under federal Speedy Trial Act and concluding that continuances requested by defendant's attorneys were attributable to defendant despite his post hoc denial that he had agreed to them).

However, even if in ordinary circumstances we would weigh the continuance against Wade, we do not need to do that here because the COVID-19 pandemic's onset made the continuance moot. Wade acknowledged in his pro se filings in the trial court that shortly before his scheduled trial date, all trials were halted in Wichita County due to the pandemic.[12] The record reflects that jury trials did not begin again until August

_____

[12]Wade points out that the prosecutor stated in voir dire that he had tried a capital murder case on March 16, 2020. The prosecutor further stated, however, that the county shut down trials right after that and that the murder case "was the last felony case tried in Wichita County until [one was tried] about two weeks ago," i.e., in August 2021. Wade directs us to no evidence that trials were allowed to begin after March 16 or

2021, when Wade's trial was held. Thus, a delay in setting a new trial date after the continuance's granting could not have been due to any action or inaction taken by Wade or his attorney.[13]

On the other hand, we agree with the State that the delay caused by the pandemic's onset cannot be attributed to the State. *State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.). The Texas Supreme Court's emergency orders restricted in-person jury trials in April and May 2020. *See Seventeenth Emergency Order Regarding COVID-19 State of Disaster*, 609 S.W.3d 119, 120 (Tex. 2020); *Twelfth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 144, 145 (Tex. 2020). The pandemic's onset was a valid reason to justify a delay.

In-person proceedings were authorized beginning in June 2020, following a court's submission of an operating plan to the Office of Court Administration (OCA) that complied with OCA's guidance. *Seventeenth Emergency Order*, 609 S.W.3d at 120. Wichita County's operating plan, adopted in May 2020, stated that "[j]ury trials will not

─────────────────

that his trial would have been permitted to go forward on its original trial date if his attorney had not been granted a continuance.

[13]During this time, Wade continued to file pro se motions. If the case's progression had been delayed because Wade had "filled the [court's] docket with repetitive and unsuccessful motions," that time delay would not have weighed in support of Wade's speedy-trial claim. *See Loud Hawk*, 474 U.S. at 315, 106 S. Ct. at 656. The State apparently did review the motions, but its only written response was a request that the trial court not consider them, which was granted. Wade filed these motions during the time when trials were not being held, so they could not have caused a trial delay.

commence until at least August 3, 2020, conditioned upon the ability of the courts to summon individuals to serve on venire panels in a safe manner."[14] "Thus, while the State's stated reason for the delay is a neutral reason, there existed an option that might have allowed the trial to have been held even during a pandemic." *Lovelace v. State*, 654 S.W.3d 42, 49 (Tex. App.—Amarillo 2022, no pet.).

The record here does not show that trials *could not have* resumed after August 2020 and before August 2021. We do not know from the record if the trial court had not been able to comply with the emergency orders' jury-trial requirements before August 2021 for reasons outside of its control. We do not know if Wichita County could have allowed jury trials before then but, out of an abundance of caution, chose not to. Not having that information matters because "even in a pandemic, the Constitution cannot be put away and forgotten." *See Huynh v. State*, No. 05-21-00991-CR, 2022 WL 17261155, at *5 (Tex. App.—Dallas Nov. 29, 2022, no pet. h.) (mem. op., not designated for publication); *cf. Black*, 2022 WL 3464563, at *7 (noting that State had offered no evidence to support its COVID-19-based excuse). For that reason, we do not include in our calculation the period from mid-March 2020 to the beginning of

---

[14]Neither party provided the trial court with a copy of the operating plan, but the plan is publicly available on the Texas Judicial Branch's website. *See* https://www.txcourts.gov/court-coronavirus-information/operating-plans; *Flores-Garnica v. State*, 625 S.W.3d 651, 657 (Tex. App.—Fort Worth 2021, no pet.) (noting that appellate courts may take judicial notice of legislative facts and of adjudicative facts that are not subject to reasonable dispute).

August 2020, but we do include the time from August 2020 to trial, and we weigh that delay period against the State—but only slightly. *Lovelace*, 654 S.W.3d at 49; *but see Parmer v. State*, No. 12-21-00159-CR, 2022 WL 3452120, at *3 (Tex. App.—Tyler Aug. 17, 2022, no pet.) (mem. op., not designated for publication) (holding that delay from March 2020 to August 2021 due to COVID-19 did not weigh against either party).

In summary, most of the delay weighs lightly against the State, but approximately seven-and-a-half months (three at the beginning of the case and four-and-a-half at the pandemic's start) weigh against neither party and are not included in our calculation of the length of delay.

### 3. Wade's Assertion of the Right

The defendant has the burden to assert the right to a speedy trial. *Hopper*, 520 S.W.3d at 924. "Although a defendant's failure to assert his [or her] right is not automatically fatal to a speedy-trial claim, a failure to assert the right will make it difficult for a defendant to prove that he [or she] was denied a speedy trial." *Id.* Wade filed multiple pro se speedy-trial motions. His first motion unequivocally requested a speedy trial and was considered by the trial court, and in response, the court set a trial date. Thus, we conclude that Wade asserted his right.

However, there is no indication in the record that the trial court was aware of Wade's pro se motion before it was set for a hearing in September 2019, much less that the trial court considered it before that time. A trial court generally does not need to consider a motion that is not brought to the court's attention. *See Guevara v. State*,

19

985 S.W.2d 590, 592 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). Further, as we note in discussing Wade's fourth issue, a trial court generally does not have any obligation to consider pro se filings by a defendant who is represented by counsel. *See Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007). That general rule has been applied to pro se speedy-trial motions. *See Floyd v. State*, 959 S.W.2d 706, 710 (Tex. App.—Fort Worth 1998, no pet.); *cf. Jones v. State*, No. 2-08-258-CR, 2010 WL 323577, at *5 & n.3 (Tex. App.—Fort Worth Jan. 28, 2010, no pet.) (mem. op., not designated for publication) (reviewing trial court's ruling on speedy-trial claim and declining to consider defendant's pro se document because it was filed while he was represented by counsel).[15] Because Wade's speedy-trial assertion was not brought to the trial court's

---

[15]Other courts have done the same. *See Valles v. State*, No. 08-18-00061-CR, 2020 WL 255746, at *3 (Tex. App.—El Paso Jan. 17, 2020, no pet.) (not designated for publication) (declining to consider appellant's pro se submissions asserting speedy trial right, which were filed while he was represented by counsel); *Ussery v. State*, 596 S.W.3d 277, 288 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (stating that defendant's pro se motions were not an unambiguous invocation of his speedy trial right because they were not required to be considered by the trial court and it was unclear if the trial court ever considered them); *Torres v. State*, No. 04-16-00622-CR, 2017 WL 5759380, at *5 (Tex. App.—San Antonio Nov. 29, 2017, no pet.) (mem. op., not designated for publication) (holding that appellant's pro se speedy trial request, which was never ruled on by the trial court, could not be considered as an assertion of the appellant's speedy trial right); *see also United States v. Alvarado*, 321 Fed. Appx. 399, 400 (5th Cir. 2009) (unpublished) (holding trial court did not abuse its discretion by striking defendant's pro se speedy trial motion because defendant was not entitled to hybrid representation); *McGregor v. State*, No. 05-02-00992-CR, 2003 WL 22511149, at *1 (Tex. App.—Dallas Nov. 6, 2003, pet. ref'd) (not designated for publication) (holding court of appeals did not have jurisdiction to consider speedy trial complaint because his attorney had not raised speedy trial complaint in the trial court and trial court was not required to consider his pro se motion). *Cf. Echols*, 2021 WL 2174148, at *8 (noting that trial courts are "often hesitant" to consider pro se motions filed by a represented defendant as

attention before September 2019, he essentially did not assert his right until approximately twenty months after his arrest. *See Russell v. State*, 90 S.W.3d 865, 873 (Tex. App.—San Antonio 2002, pet. ref'd) (noting that a lengthy delay in asserting the speedy-trial right attenuates a claim for violation of the right).

After trial was continued at his attorney's request, Wade filed other pro se motions that included a speedy-trial demand. Because the trial court did not consider Wade's post-continuance pro se filings and was not required to do so, we may conclude that Wade did not assert his speedy-trial right at any point after the September 2019 speedy-trial hearing. A failure to pursue the right weakens a speedy-trial claim. *See Ingram v. State*, No. 04-09-00249-CR, 2010 WL 1609696, at *3 (Tex. App.—San Antonio Apr. 21, 2010, no pet.) (mem. op., not designated for publication); *see also Haney v. State*, 977 S.W.2d 638, 642 (Tex. App.—Fort Worth 1998, pet. ref'd) (en banc) (holding that because appellant did not pursue his speedy-trial right soon enough and with "sufficient persistence and aggressiveness," that factor weighed against him), *abrogated on other grounds by Howland v. State*, 990 S.W.2d 274 (Tex. Crim. App. 1999).

However, even if we considered the pro se documents filed by Wade after the continuance and the onset of COVID-19, they would weaken rather than strengthen his claim because beginning in August 2019, what Wade asked for was dismissal of the

---

strong evidence of an assertion of the speedy trial right); *Harden v. State*, 152 So. 3d 626, 627 (Fla. Dist. Ct. App. 2014) ("[A] pro se demand for speedy trial that has not been adopted by the defendant's counsel cannot be entertained on the merits.").

charges. Even on the very day that the trial court gave him what he ostensibly wanted—a trial setting—he wrote a pro se document requesting dismissal because the trial date was set six months away. *See Phillips v. State*, 650 S.W.2d 396, 401 (Tex. Crim. App. 1983) (stating that a request for dismissal rather than speedy trial may attenuate the strength of defendant's speedy-trial claim); *McCarty v. State*, 498 S.W.2d 212, 215–16 (Tex. Crim. App. 1973) (same); *Black*, 2022 WL 3464563, at *9 (same). In other words, Wade did not assert his right for twenty months after his arrest, and either he did not re-assert his speedy-trial right after the initial trial setting was continued (if we do not consider his post-continuance pro se filings), or (if we consider the pro se filings) he weakened his claim by seeking dismissal. This factor weighs against Wade, but only slightly.

### 4. Prejudice

Unless the delay before trial is presumptively prejudicial, a defendant has the burden to show that the final *Barker* factor weighs in his or her favor, and to do so, the defendant has to show that the delay actually caused prejudice. *See Cantu*, 253 S.W.3d at 280–81. Because the delay in this case was not long enough to shift the burden to the State, Wade had that burden. *See Voda*, 545 S.W.3d at 744; *Washington v. State*, No. 02-14-00454-CR, 2016 WL 4538566, at *10 (Tex. App.—Fort Worth Aug. 31, 2016, pet. ref'd) (per curiam) (mem. op., not designated for publication).[16]

---

[16]In *Washington*, this court held that even when the delay is presumptively prejudicial, the defendant must nonetheless make a prima facie showing of prejudice before the State has any burden to negate it. *Washington*, 2016 WL 4538566, at *10. The Court of Criminal Appeals had already rejected that reasoning, but in an unpublished

In determining prejudice, we consider the delay's effect on three categories of interests: "(1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired." *Hopper*, 520 S.W.3d at 924. The most serious interest is the harm to the defendant "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193. For example, a defendant may be prejudiced by a witness's death or disappearance or if defense witnesses are "unable to recall accurately events of the distant past." *Id.*

Wade suffered at least some prejudice from pretrial incarceration.[17] *See Lovelace*, 654 S.W.3d at 50; *Washington*, 2016 WL 4538566, at *11. This prejudice, however, is not

---

opinion. *Gonzales v. State*, No. PD-0724-12, 2013 WL 765575, at *1 (Tex. Crim. App. Feb. 27, 2013) (not designated for publication); *see* Tex. R. App. P. 77.3. Then in 2014, the Court of Criminal Appeals again put the burden on the State to negate prejudice when the delay is "so excessive that it 'presumptively compromises the reliability of a trial in ways that neither party can prove or identify.'" *Gonzales*, 435 S.W.3d at 812 (quoting *Shaw*, 117 S.W.3d at 890, and holding that "[i]n such instances, the defendant is absolved from the requirement to demonstrate prejudice").

[17]The record reflects that Wade was also charged in cause number 59641-C for failing to update his address with his primary sex-offender registration authority. Further, his pro se filings and trial testimony indicate that he also had another criminal case pending against him in county court for continuous family violence. The record does not show the disposition of the charges in the other cases, whether he was detained on those charges while this case was pending, and, if so, for how long. Accordingly, we cannot conclude that his incarceration on those charges negated any prejudice from his pretrial incarceration in this case. *See Webb v. State*, 36 S.W.3d 164, 174 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (holding that appellant could not show prejudice from pretrial incarceration when he was already incarcerated for another offense); *see also Thames v. State*, No. 02-17-00295-CR, 2019 WL 237556, at *9 (Tex. App.—Fort Worth Jan. 17, 2019, no pet.) (mem. op., not designated for publication) (holding that

23

sufficient alone to establish the right to dismissal. *See Jones*, 2010 WL 323577, at *7; *Meyer v. State*, 27 S.W.3d 644, 651 (Tex. App.—Waco 2000, pet. ref'd), *abrogated on other grounds by Robinson*, 240 S.W.3d at 922.

Wade asserts in his brief that his pretrial incarceration caused him to lose work experience and wages that "he might have . . . earned." However, Wade offered no evidence of any lost wages or work experience. Wade refers only to a statement that he had included in a pro se motion in which he stated, with no elaboration, that he had "lost work experience." *See Newman v. State*, 331 S.W.3d 447, 449 (Tex. Crim. App. 2011) (noting general rule that an unsworn motion does not, by itself, present evidence upon which relief can be granted for a speedy-trial violation); *Nelson v. State*, 629 S.W.2d 888, 890 (Tex. App.—Fort Worth 1982, no pet.) (stating a motion is not evidence); *cf. Zamorano*, 84 S.W.3d at 654 (noting that the appellant had testified to at least $1,320 in lost wages due to court appearances); *State v. Burckhardt*, 952 S.W.2d 100, 104 (Tex. App.—San Antonio 1997, no pet.) (holding that the defendant had shown prejudice from loss of jobs due to trial re-settings, at least one of which lost him a $125,000 payment).

Wade also asserts that he specifically documented the negative effect that incarceration was having on his health. This argument is based on the same pro se

---

appellant could not show prejudice from pretrial incarceration when he was incarcerated for the entire period between his arrest and his demand for a speedy trial on an unrelated charge in another county).

motion in which he claimed to have lost wages. In that motion, he stated that he had "lost weight and [his] appearance is changed due to lack of sunlight as his countenance is result[ant]ly altered[,] which may be prejudicial to the jury." Again, we do not consider the motion as evidence, but even if we did, it does not show that Wade felt anxiety beyond the anxiety that would normally arise from criminal charges or pretrial incarceration, and nothing supports his claim that his alleged weight loss or more pale appearance would affect the jury's view of him. *See Shaw*, 117 S.W.3d at 890 (stating that appellant had not demonstrated any anxiety beyond the level normally associated with being charged with a felony sexual crime); *Jones*, 2010 WL 323577, at *7 (holding that defendant did not establish that his anxiety from pretrial incarceration was either abnormal or caused his case prejudice). *Contra Bosworth v. State*, 422 S.W.3d 759, 771–72 (Tex. App.—Texarkana 2013, pet. ref'd) (stating that the appellant showed prejudice from pretrial incarceration because evidence indicated that he needed but did not receive medication to help him moderate his behavior or treat a mental disorder).

Wade further argues that "given the number and intensity of his motions and appeals, it is inconceivable that he did not suffer 'prolonged anxiety.'" However, the existence of the filings alone does not show whether it was anxiety, a need for control, or some other motive that prompted him to file so many pro se motions while represented by counsel.

Regarding the last, most important interest, Wade argues that his pretrial incarceration "prevented him from looking for evidence that might have exonerated

25

him, such as finding the white pickup [that E.B.] claimed to have been the scene of the crime when his [truck] was silver and finding whether the owner or driver was a viable alternate suspect."[18] However, as the State points out, Wade's trial theory was that the incident never happened at all and that the complainant made it up in conspiracy with his ex-wife to help her gain custody of the couple's children.[19] Wade testified to that effect at trial and made similar statements in one of his pro se filings. There is nothing in the record indicating that Wade believed that the offenses were actually committed but by someone else or that he wanted to find the true culprit but was unable to do so because of his incarceration. Further, although Wade argues that he "had no means to make up for his attorney's neglect of his case by investigating it himself," from the record, we cannot determine what his attorney did or did not do to investigate the case,

---

[18]In the fact section of his brief, Wade states that in his testimony, he pointed to another man, Russell Klimic, as being the likely culprit in this case. Wade was apparently incarcerated with Klimic at some point. Wade argues that Klimic had a white pickup truck like the one described by E.B. and that in a CPS case, Klimic was said "to have given Ms. B_____ [that is, E.B.] a ride to McDonald's and to have had sex with her before taking her home." We disagree that Wade testified that Klimic was alleged to have sexually assaulted E.B. Wade said that allegations involving a girl were made in a CPS case involving Klimic, but he did not name the girl. Further, his testimony at trial does not comport with his argument on appeal. His testimony was not that the alleged acts in his case actually occurred but were committed by Klimic. Instead, at trial, he seemed to be using the supposed allegations against Klimic to suggest that CPS had made false allegations of child sexual assault against both men. He told the jury, "You would think CPS would at least change up on their lies." Wade does not include any assertions about Klimic in his arguments under this issue.

[19]His ex-wife's parental rights to the two children were terminated before Wade's trial in this case.

and Wade does not explain what, other than his new defensive theory, needed investigating.[20]

In summary, Wade failed to show any prejudice beyond that which usually arises from pretrial incarceration or from being accused of a crime, and we therefore conclude that any prejudice that he suffered was real but minimal.[21] *See Jones*, 2010 WL 323577, at *7.

### 5. Balancing and Conclusion

Finally, we balance the above factors. The Court of Criminal Appeals has explained the approach that courts must take in the balancing:

> Because dismissal of the charges is a radical remedy, a wooden application of the *Barker* factors would infringe upon "the societal interest in trying people accused of crime, rather than granting them immunization because of legal error." Thus, courts must apply the *Barker* balancing test with

[20]The record does show, however, that Wade and his attorney had some disagreement about how to conduct Wade's defense. Information on that point was elicited when Wade's attorney questioned him outside the jury's presence regarding his desire to testify and his desire for his attorney to call certain witnesses against the attorney's advice, as well as when the State took Wade on voir dire about a defense exhibit. Wade's attorney questioned Wade about those matters and explained why he had not done as Wade asked. For example, regarding specific witnesses Wade wanted his attorney to call to testify, the attorney explained that each person had information detrimental to Wade that had not been brought out in the State's case.

[21]As the State mentions, at the hearing on the speedy trial motion, Wade mentioned "witnesses on [his] behalf that ha[d] a tendency to be like a gypsy and move away" and that he did not "want the State or the county to procure the unavailability of any witnesses that [he] believe[d] [wa]s pertinent to [his] case." He did not name those witnesses at the hearing. There is no evidence in the record about whether there were any witnesses whom Wade wanted to call but could not because they had become unavailable. Perhaps for that reason, Wade did not mention this assertion in his brief as a ground for a prejudice finding.

common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. The constitutional right is that of a speedy trial, not dismissal of the charges.

*Cantu*, 253 S.W.3d at 281 (quoting *United States v. Ewell*, 383 U.S. 116, 121, 86 S. Ct. 773, (1966)).

On balance, the factors do not support dismissal. Seven-and-half months of the delay were justified. Much of the remaining delay weighs only slightly against the State. There was no evidence of bad faith on the part of the State or that the State engaged in purposeful dilatory tactics. *See Ussery*, 596 S.W.3d at 291 (stating that "although the delay of three and a half years was excessive, the State bore a low degree of culpability for the delay"). Wade asserted his speedy-trial right, and the trial court was made aware of that assertion, but not until approximately twenty months after Wade's arrest, and Wade further weakened his claim by not re-asserting his right after the continuance (if we do not consider his pro se filings) or by seeking dismissal (if we do consider the filings). Wade did suffer some prejudice from pretrial incarceration, and that prejudice presumably increased over time due to the length of his incarceration, but the prejudice was nevertheless minimal. There was no evidence of any specific prejudice other than that which he ordinarily would have suffered from pretrial incarceration and a charge of sexually assaulting a minor.

Weighing all of the factors together and bearing in mind that dismissal is a radical remedy, we hold that Wade failed to establish a violation of the right to a speedy trial

28

that was serious enough to warrant a dismissal of his case. *See id.*; *see also Black*, 2022 WL 3464563, at *12; *State v. Harbor*, 425 S.W.3d 508, 515 (Tex. App.—Houston [1st Dist.] 2012, no pet.). We overrule Wade's first issue.

## II. Double Jeopardy (Issues Two and Three)

In Wade's second issue, he asserts that in sexual assault cases, a defendant may be prosecuted for only as many statutorily specified body parts he penetrates in the same encounter, that in this case the State alleged only one encounter in which the complainant's mouth and sexual organ were penetrated but obtained four penetrative convictions, and that counts 3 and 4 are therefore barred by the Double Jeopardy Clause. In Wade's third issue, he argues that count 5 is also barred by double jeopardy because of his conviction on count 2. Count 2 alleged penetration of the complainant's sexual organ by Wade's sexual organ, and count 5 alleged contact between the same two organs. Wade argues that double jeopardy bars conviction of both a penetrative conviction and a contact conviction for one criminal impulse in which penetration occurs, and no evidence existed in this case of contact without penetration.

### A. Double Jeopardy and Preservation

Wade did not raise a double jeopardy objection in the trial court, but a party may raise the issue for the first time on appeal "when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *Gonzalez v. State*,

29

8 S.W.3d 640, 643 (Tex. Crim. App. 2000). We thus look to the face of the record to see if the undisputed facts reveal a double jeopardy violation.

Wade relies on two Court of Criminal Appeals cases: *Hernandez v. State*, 631 S.W.3d 120, 124 (Tex. Crim. App. 2021), and *Aekins v. State*, 447 S.W.3d 270, 282–83 (Tex. Crim. App. 2014). Citing *Hernandez*, he argues under his second issue that he could not be prosecuted on both count 2 and count 3 because both counts alleged penetration of E.B.'s sexual organ (once with his sexual organ as alleged in count 2, and once with his finger as alleged in count 3). He further argues that he could not be prosecuted on both counts 1 and 4 because both counts alleged penetration of E.B.'s mouth with his sexual organ. *See* 631 S.W.3d at 124. Citing *Aekins*, Wade argues under his third issue that a defendant "may not be convicted for a completed sexual assault by penetration and also for conduct (such as exposure or contact) that is demonstrably and inextricably part of that single sexual assault," and thus he cannot be convicted of both the contact alleged in count 5 and of the penetration alleged in count 2. *See Aekins*, 447 S.W.3d at 281.

*Hernandez* addressed when conduct may be considered a lesser-included offense of a charged offense, but its analysis is also useful in the double jeopardy context because a defendant cannot be convicted of both an act and its lesser-included conduct. 631 S.W.3d at 124. As Wade points out, *Hernandez* stated that "[a]n offender may be

prosecuted for as many statutorily specified body parts as he penetrates."[22] *Id.* However, *Hernandez* did not address a situation like the one in this case, and it did not hold that, no matter how many times a complainant's mouth or sexual organ is penetrated during a single encounter, the defendant cannot be charged more than once for each body part. *See id.* at 122 (holding that touching one body part is a separate offense than penetrating a different body part, and thus the defendant's touching of the complainant's vagina with his hand and his rubbing his penis on her torso were separate indecency offenses and not lesser-included offenses of the offense of penetrating her mouth with his penis).

As explained in *Aekins*,

> [i]f the victim says Dangerous Dan raped her, then forced oral sex, then raped her again, then forced oral sex again—*there are four criminal convictions possible.* . . . [S]eparate acts of penetration with different instruments (say, with a sex toy and with a penis) constitute two distinct ultimate acts. This is why appellant may be punished for the two penetration counts in this case (penetration by finger and penetration by mouth), even though they are proscribed by the same subsection of sexual assault—Texas Penal Code § 22.011(a)(1)(A)—without offending the Double Jeopardy Clause.

447 S.W.3d at 282–83 (footnotes omitted and emphasis added).

---

[22]Wade also cites *Jourdan v. State* for the same proposition. 428 S.W.3d 86, 96 (Tex. Crim. App. 2014). However, *Jourdan* does not hold that a defendant may be charged with only one offense no matter how many times a particular body part is penetrated in one encounter. In *Jourdan*, the defendant had been charged in two paragraphs with one count of sexual assault. *Id.* at 88 n.2. The trial evidence could support a finding that the defendant penetrated the complainant's vagina with his penis or with his finger, and one question before the court was whether the jury had to be unanimous about how the one alleged penetration occurred. *Id.* at 91–92, 94. *Jourdan* did not address a situation in which a defendant engages in multiple separate and completed acts of penetration in one encounter.

In proving a sexual assault case, penetration necessarily requires contact, *Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004), but contact does not require penetration. Thus, if an indecent contact "is not simply preparatory to an act of penetration," the contact "is itself a complete, ultimate act." *Aekins*, 447 S.W.3d at 282. In a footnote to *Aekins*'s discussion of the United States Supreme Court's opinion in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180 (1932), the court explained how a defendant may be convicted of multiple offenses for multiple violations of the same statute over a short period of time—for example, penetration of a complainant's mouth and sexual organ, *see* Tex. Penal Code Ann. § 22.011(a)—but may not be convicted for acts that are necessarily part of a single violation:

> For example, one rape will frequently involve the defendant's acts of exposing his genitals, then contacting the victim's genitals with his own, then penetrating the victim's genitals with his. It is a "continuing" crime in the sense that the defendant commits several criminal acts on the way to completing the rape, but the lesser acts of exposure and contact merge into the ultimate act of penetration. *Patterson*, 152 S.W.3d at 92. If, on the other hand, the actor rapes the same woman five times during the course of an evening, he, like the defendant in *Ebeling*, may be prosecuted for five different aggravated sexual assaults; it is the same crime committed five separate times.

*Id.* at 277 n.28. In other words, a defendant may be charged for each distinct ultimate act.

**B. Analysis of Issues Two and Three**

Resolution of these issues turns on the conduct to which E.B. testified. E.B. testified to the following acts during the encounter. First, she stated,

He just moved closer to me[,] and he was rubbing my thighs and touching my shoulder and trying to kiss me. And I asked him again if I can—if he could just take me home. He still said no. And then he pulled his penis out and told me to suck it. And I did because I felt if I didn't, then he would have made me walk home or wouldn't have taken me home.

This testimony described the conduct charged in count 1, "the penetration of the mouth of [E.B.], a child who was then and there younger than 17 years of age, by the defendant's sexual organ."

E.B.'s testimony then continued,

A. After that, he told me that we could have sex now, so I laid down and I took my pants off and he took his off and he got to on top of me.

Q. Did you want to have sex with him?

A. No.

Q. Did he offer you anything to have sex?

A. He offered me money.

. . . .

A. He puts his penis inside of me and we have sex.

This testimony described conduct charged in count 2, the penetration of E.B.'s sexual organ by Wade's sexual organ.

E.B. further testified,

And I asked him again if he could take me home. He said no. And he offered me more money—well, I asked him if I did it again if he could give me more money because I needed money really bad. And he said yes. So he told me to suck his penis to try to get it hard[,] and it didn't[,] and he said it might get hard if he puts it in me, but it didn't.

Q. Okay. I—I hate to ask you these questions, but some of these things I have to ask so that we can clarify. You said he put it in you, like where did he put his penis?

A. In my vagina.

This testimony described the conduct charged in count 4, the penetration of E.B.'s mouth by Wade's sexual organ, and count 5, contact of E.B.'s sexual organ by Wade's sexual organ.

Finally, E.B. described one other act:

Q. Did he ever put anything else besides his penis inside your vagina?

A. His fingers.

Q. Okay. And when was that?

A. After the first time we did it.

This testimony describes the conduct charged in count 3, the penetration of E.B's sexual organ by Wade's finger. In summary, E.B.'s testimony was that Wade penetrated her mouth with his sexual organ (count 1), then penetrated her sexual organ with his sexual organ (count 2), then penetrated her sexual organ with his finger (count 3), then penetrated her mouth with his sexual organ (count 4), and finally contacted her sexual organ with his sexual organ (count 5).

Based on this testimony, we disagree that the contact alleged in count 5 was part of the penetration alleged in count 2 because the contact alleged in count 5 was not part of a single continuous act that ended with the penetration alleged in count 2. *See id.* at 283. It was not "simply preparatory to an act of penetration," *see id.* at 282, but was a

34

separate act of contact that came *after* the penetration alleged in count 2 and after two other charged acts—penetration of E.B.'s sexual organ with his finger and penetration of her mouth. Thus, conviction on both counts is not a double-jeopardy violation.

We also reject Wade's argument that double jeopardy prevents his conviction on both two and three and on both counts one and four. Counts two and three alleged two separate ultimate acts: Wade penetrated E.B.'s sexual organ with his sexual organ as alleged in count 2 and then, *after* that act, penetrated her sexual organ with his finger as alleged in count 3. Likewise, he penetrated her mouth with his sexual organ as alleged in count 1, and then, after a series of other acts, did so again as alleged in count 4.

In his reply brief, Wade relies on *Jackson v. State*, 567 S.W.3d 405, 407–08 (Tex. App.—Texarkana 2018, no pet.). That case is easily distinguishable. In that case, the defendant was charged with and convicted of continuous sexual abuse and of aggravated sexual assault of the same child, even though the specific aggravated sexual assault and the continuous sexual assault both occurred within the same time frame. *Id.* A charge of continuous sexual assault for a certain time period includes acts of sexual abuse occurring within that same time period and prohibits convictions for both. *See id.* at 407 (citing *Price v. State*, 434 S.W.3d 601, 606 (Tex. Crim. App. 2014)); *see also* Tex. Penal Code Ann. § 21.02(e)(2). In *Jackson*, the defendant was improperly convicted of both. *Jackson*, 567 S.W.3d at 407–09. Here, the State did not charge Wade with continuous sexual assault, so that analysis does not apply.

35

Wade further relies on *Gonzalez v. State*, 516 S.W.3d 18, 21 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd). That case involved a defendant convicted of three counts of driving while intoxicated with a child passenger—one conviction for each child who was in the vehicle that the defendant was driving when she was involved in a traffic accident. *Id.* Under the applicable statute, the allowable unit of prosecution was one offense for each incident of driving or operating a vehicle; thus, although there were three children in the car, the defendant committed only one offense. *Id.* at 22, 24. The *Gonzalez* case did not involve the sexual-assault statute as issue here.

### C. Issues Two and Three Conclusion

Because counts 1, 2, 3, and 4 alleged separate ultimate acts, we overrule Wade's second issue. Additionally, because the conduct charged in count 5 was a complete, ultimate act separate from—and was not conduct that was "simply preparatory to"— the penetration charged in count 2, we overrule Wade's third issue. *See Aekins*, 447 S.W.3d at 282.

### III. Conflict of Interest (Issue Four)

Wade asserts in his fourth issue that he was denied the constitutional right to a judicial determination of his pro se motion raising a conflict of interest with his second appointed attorney. Wade asserted a potential conflict in a five-page, handwritten habeas petition raising multiple categories of complaints. He stated in one sentence that his attorney had a conflict of interest because the attorney represented "Marcos M. Rodriguez[,] who is mentioned in the Discovery Material as a potential witness for the

State." Nothing in the record confirms if Rodriguez was in fact represented by Wade's attorney, and nothing indicates whether any such representation was related to this case in some way. Wade also filed a "Withdraw of Counsel Inquiry" stating that he wanted his attorney to withdraw because "[d]efense counsel has an ethical obligation to advise the court promptly when a conflict of interest arises and the conflict of interest negates the unimpaired loyalty a defendant is constitutionally entitled to expect and receive from his attorney." However, it did not elaborate on what conflict, if any, existed.

As noted, the trial court declined to consider his pro se motions and thus did not rule on any motion asserting a conflict of interest. The State asserts that Wade never brought his claim of his counsel's conflict to the trial court's attention and that the record does not establish any conflict. Wade replies that his pro se motions for writ of habeas corpus were sufficient to make the trial court aware of his complaints.

## A. Trial Court's Duty to Investigate Conflicts of Interest

When a defendant or the defendant's attorney brings a potential conflict of interest to the trial court's attention through a pretrial motion or trial objection, the trial court has an obligation to investigate. *Routier v. State*, 112 S.W.3d 554, 581 (Tex. Crim. App. 2003) (citing *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S. Ct. 1173, 1178 (1978)). If the defendant does not bring the potential conflict to the trial court's attention but argues on appeal that the trial court nevertheless should have been aware of the conflict, the defendant is not entitled to reversal "unless he [or she] shows that [the] attorney was operating under an actual conflict of interest that adversely affected counsel's

37

performance." *Id.* at 581–82. "[A]n actual conflict of interest exists when 'counsel is required to make a choice between advancing his [or her] client's interest in a fair trial or advancing other interests (perhaps his [or her] own) to the detriment of [the] client's interest.'" *Id.* at 582 (quoting *James v. State*, 763 S.W.2d 776, 779 (Tex. Crim. App. 1989)).

**B. Analysis**

There is no dispute that Wade made a pro se assertion that his trial counsel had a conflict of interest. There is likewise no dispute that the trial court did not investigate any potential conflict of interest. The question here is whether Wade's pro se filings were sufficient to bring the issue to the trial court's attention and to obligate the trial court to investigate.

In resolving this question, the key phrase is "brought to the trial court's attention." *See Dunn v. State*, 819 S.W.2d 510, 519 (Tex. Crim. App. 1991) (noting trial court has obligation to inquire into a conflict problem "once [the problem] is brought to [the court's] attention"). Wade asserts that his mere filing of his pro se motion was sufficient and that he did not need to set the motion for a hearing or to raise the matter in open court. This argument suggests that either the State had a duty to raise the issue with the trial court or that the trial court had an independent duty to read all of Wade's pro se filings—despite Wade's representation by counsel—to check if the documents

raised a conflict. The State asserts that Wade filed more than 200 handwritten pages of pro se documents and motions.[23]

Wade cites no authority for the proposition that the State has a duty to bring a potential conflict of interest to the trial court's attention, and we have found none. As for the trial court's duty, a court clerk's knowledge of a filing is not imputed to the trial court, and thus, the mere act of filing a document with the clerk is not generally enough to bring the document to the trial court's attention. *In re Hearn*, 137 S.W.3d 681, 685 (Tex. App.—San Antonio 2004, orig. proceeding) (concerning inmate's pro se motion); *see also In re Fox*, Nos. 05-21-00774-CV, 05-21-00775-CV, 2021 WL 5275826, at *2 (Tex. App.—Dallas Nov. 12, 2021, orig. proceeding) (mem. op.) (concerning pro se habeas application). Further, even if we were to hold that the mere filing of a motion or habeas corpus petition could in some cases be enough to bring a conflict to the trial court's attention, a defendant represented by counsel has no right to hybrid representation. *Landers v. State*, 550 S.W.2d 272, 280 (Tex. Crim. App. 1977). Consequently, "a trial court is free to disregard any pro se motions presented by a defendant who is represented by counsel." *Robinson*, 240 S.W.3d at 922.

Wade asserts that "[t]he filing of a pro se motion was all the defendant did in *Orgo v. State*, 557 S.W.3d 858, 859–60 (Tex. App.—Houston [14th Dist.] 2018, no pet.), and it was evidently sufficient." As an argument that under *Orgo*, his pro se motions

---

[23]Not only are they over-200 pages handwritten, they are also single spaced.

were sufficient, his contention has two flaws. First, *Orgo* is not an opinion of this court and is not binding on this court. *See Sapp v. State*, No. 02-17-00161-CR, 2018 WL 1865934, at *3 n.6 (Tex. App.—Fort Worth Apr. 19, 2018, no pet.) (mem. op., not designated for publication). Second, *Orgo* does not reveal how the defendant's pre-trial pro se motion came to the trial court's attention. The opinion states only that "[t]he trial court held a hearing on appellant's pro se motion to dismiss her appointed lawyer five days before her trial was set to begin." 557 S.W.3d at 859–60. Then, at a hearing on the day of trial, the defendant told the trial court about what she viewed as a conflict with her attorney. *Id.* at 860. *Orgo* does not hold that a trial court has an independent duty to review a defendant's pro se filings when the defendant has an attorney.

Because the trial court had no duty to consider Wade's pro se filings, the act of filing them was not alone sufficient to bring any potential conflict to the trial court's attention. We further note that the record does not show that Wade raised this potential conflict at any pretrial hearing or at trial.[24] *See Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.

---

[24]In the *Faretta* hearing held after the State rested, Wade stated, "I would just like to give judicial notice if possible that prior to this trial, I had requested the Court to give me this set hearing to represent myself to withdraw [his appointed attorney] for those conflict of interests that I have included in those pro se motions." Wade did not mention this assertion in his brief, perhaps because in that statement, Wade did not tell the court what the alleged conflict was or specify which of his many pro se motions had raised the alleged conflict. No hearing is required when a defendant makes only a conclusory allegation of conflict—as Wade recognizes in his brief—and no hearing is required when no valid basis for the conflict is asserted. *See Calloway v. State*, 699 S.W.2d 824, 831 (Tex. Crim. App. 1985) (holding defendant is not entitled to automatic reversal on the basis that trial court failed to inquire about conflict of interest when the alleged conflict "is advanced without some allegation or assertion of a logical supporting fact");

40

Ct. 1708, 1717 (1980) ("Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry."); *cf. Estrada v. State*, 313 S.W.3d 274, 316 (Tex. Crim. App. 2010) (noting that appellant had not preserved claims related to charge error because although appellant had filed a motion to charge the jury on mitigating evidence, he did not bring the motion to the trial court's attention and obtain a ruling on it).

Because no potential conflict was brought to the trial court's attention, to prevail on this issue, Wade had to show that his attorney was operating under an actual conflict of interest. The record does not demonstrate any conflict. If his trial attorney had been representing Rodriguez in some matter, the record does not disclose what that matter was and does not show that pursuing Rodriguez's or the attorney's interest was contrary to Wade's interest in a fair trial. *See Routier*, 112 S.W.3d at 581–82. Accordingly, we must overrule this issue.

---

*Howard v. State*, 966 S.W.2d 821, 826 (Tex. App.—Austin 1998, pet. ref'd) ("A conflict of interest claim that is advanced without some allegation of a logical supporting fact does not obligate the trial court to conduct a hearing or entitle the defendant to reversal without a showing of harm."); *see also Sturgis v. State*, No. 11-18-00016-CR, 2020 WL 508271, at *5 (Tex. App.—Eastland Jan. 31, 2020, no pet.) (mem. op., not designated for publication) (noting that it is not necessary for a trial court to hold a hearing on an alleged conflict when there is not a valid basis asserted for the conflict). Further, by the time that Wade made this assertion at trial, the State had rested without calling Rodriguez as a witness.

**C. Issue Four Conclusion**

We recognize the difficulty that a defendant may face if his or her appointed attorney has a potential conflict but does not bring the conflict to the trial court's attention. However, we decline to impose a new duty on trial courts to scour every document filed by a defendant represented by counsel on the offhand chance that the defendant raises a conflict. Because any potential conflict was not brought to the trial court's attention, and because the record does not establish any actual conflict, we overrule Wade's fourth issue.

**IV. Denial of Counsel at Sentencing (Issue Five)**

In Wade's fifth and final issue, he contends that he was constructively denied counsel because, during a critical phase, his attorney entirely failed to subject the prosecution's case to meaningful adversarial testing. He asserts that his counsel stipulated to an enhancement but then later asked that the enhancement be quashed for lack of notice, and he "waived opening, presented no evidence, and at closing merely asked—without reasons—for concurrent sentencing and that the stipulated-to enhancement be found 'not true.'" He contends that under *United States v. Cronic*, 466 U.S. 648, 658–660, 104 S. Ct. 2039, 2046–47 (1984), the attorney's performance was so deficient as to require reversal. In response, the State argues that the two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), applies to Wade's ineffective assistance claim and that Wade cannot sustain either prong. We agree with the State.

## A. Reviewing Ineffective Assistance Claims

The El Paso Court of Appeals has provided a clear explanation for how we review ineffectiveness claims and how *Cronic* applies to that standard:

> In the usual case, an appellant, in order to obtain a reversal of his conviction on the ground of ineffective assistance of counsel, must demonstrate both deficient performance and prejudice. *Cannon v. State*, 252 S.W.3d 342, 349–50 (Tex. Crim. App. 2008). That is, he must demonstrate, by a preponderance of the evidence, that: (1) his trial counsel's performance was deficient and (2) harm resulted from that deficiency sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. . . .

> An attorney's performance is deficient when it falls "below an objective standard of reasonableness" under prevailing professional norms and according to the necessity of the case. *Ex Parte Moore*, 395 S.W.3d 152, 156–57 (Tex. Crim. App. 2013). . . .

> In evaluating trial counsel's performance, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance and was motivated by sound trial strategy. *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003). When the record is silent concerning the reasons for trial counsel's actions, we do not engage in speculation to find ineffective assistance of counsel. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). Accordingly, ineffective assistance claims must be firmly found[ed] in the record and the record must affirmatively show the alleged ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) [(citing] *Thompson*[ v. State], 9 S.W.3d [808,] 814 [(Tex. Crim. App. 1999)].

> However, if an appellant can demonstrate that defense counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," so that there was a constructive denial of the assistance of counsel altogether, then prejudice, because it is "so likely," is legally presumed. [*Cronic*,] 466 U.S. [at] 648 . . . , 104 S. Ct. [at] 2046–47. . . ; *see also Bell v. Cone*, 535 U.S. 685, 696–97, 122 S. Ct. 1843, 1851 . . . (2002) (noting that, under *Cronic*, defense counsel's failure to test the prosecution's case must be "complete" before prejudice is presumed); *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067 ("constructive denial of the

assistance of counsel altogether is legally presumed to result in prejudice"); *Ex Parte McFarland*, 163 S.W.3d 743, 752–53 (Tex. Crim. App. 2005) (discussing constructive denial of counsel and presumed prejudice).

*State v. Frias*, 511 S.W.3d 797, 809–11 (Tex. App.—El Paso 2016, pet. ref'd) (holding that although the appellant complained "about counsel's conduct concern[ing] a litany of alleged errors, omissions, and strategic blunders," the record did not support a finding that *Cronic*'s presumption of prejudice applied). As the Texas Court of Criminal Appeals has explained, under *Cronic*, a defendant is denied counsel when his attorney is physically absent from the proceeding or when the attorney is mentally absent, "i.e., counsel is asleep, unconscious, or otherwise actually non compos mentis." *McFarland*, 163 S.W.3d at 752 (footnotes omitted). "This prong of *Cronic* is epitomized by the 'inert' or 'potted plant' lawyer who, although physically and mentally present in the courtroom, fails to provide (or is prevented from providing) any meaningful assistance." *Id.*

## B. Analysis

Wade contends that he has not raised an ineffectiveness claim under *Strickland* and that the only relevant standard is *Cronic*'s constructive-denial-of-effective-assistance standard, which presumes prejudice from the attorney's performance. Citing *Cannon v. State*, Wade argues that "constructive denial occurs not only where the defendant has a 'potted plant' attorney, . . . but [also] where defense counsel provides only feeble, obviously pointless assistance that would get his client little or nothing." *See* 252 S.W.3d at 350.

44

However, in *Cannon*, the defendant's attorney was unprepared for trial and thus, after unsuccessfully moving for a continuance and a recusal of the trial judge, refused to participate in the trial. *Id.* The attorney moved for an instructed verdict and brought a sentencing mistake to the trial court's attention, but he declined to participate in jury selection, to enter a plea for his client, to make an opening or closing argument, to cross-examine any of the State's witnesses, to make any objections, to offer any defense, to request any special jury instructions, or to offer any evidence or argument at punishment. *Id.* The defendant's attorney, "although physically present in the courtroom at all the requisite times, effectively boycotted the trial proceedings and entirely failed to subject the prosecution's case to meaningful adversarial testing," and "[b]y his refusal to participate, defense counsel abandoned his role as advocate for the defense and caused the trial to lose its character as a confrontation between adversaries." *Id.*

The attorney in this case did more than the attorney in *Cannon*. For one thing, he participated in the guilt/innocence stage. He also made a closing argument, albeit one that Wade considers deficient. Wade points to the attorney's failure to make objections, but when the State offered its evidence at punishment, it "reoffer[ed] all of the evidence from the guilt/innocence portion of the trial subject to the same objections and the same rulings." Wade's attorney then asked that his previous objections be preserved. Thus, the State's offer of evidence was made subject to Wade's prior objections.

Wade also complains that after his attorney had stipulated to the admissibility of Wade's prior indecency-with-a-child conviction, his attorney moved to quash the enhancement based on that prior conviction on the ground that the State had not provided timely notice of enhancement. Wade characterizes that objection as futile and as another example of how his attorney provided pointless assistance.[25] But making a pointless objection is not the equivalent of doing nothing. To the extent that Wade argues that a futile objection renders an attorney's representation ineffective, that argument would be properly addressed in a *Strickland* analysis, not an analysis under *Cronic*.

In summary, this is not a *Cronic* situation. This is a *Strickland* situation. However, Wade does not include any alternative *Strickland* arguments in his brief. Instead, he asserts in his reply brief that "[n]o *Strickland* claim is before th[is] Court and, contrary

---

[25]The pre-trial stipulation to the conviction was for purposes of Texas Code of Criminal Procedure Article 38.37, which governs the admissibility of certain extraneous offenses at trial, and his trial objection was on a different basis—that regardless of the admissibility of the prior conviction, the State could not use the prior conviction for enhancement purposes under Texas Penal Code Section 12.42 because it had not provided enough notice of its intent to do so. *See* Tex. Penal Code Ann. § 12.42; Tex. Code Crim. Proc. § 38.37. It is not clear whether the attorney thought that the objection had merit, but the Court of Criminal Appeals has held that when the defendant stipulated to a prior conviction, the defendant had no defense to an enhancement allegation based on that conviction, and thus the State's notice of enhancement provided at the beginning of the punishment phase was sufficient. *See Villescas v. State*, 189 S.W.3d 290, 295 (Tex. Crim. App. 2006). As the State points out, Wade had filed a pro se pre-trial motion objecting to the enhancement notice, and it is possible that his attorney raised the timeliness objection at Wade's urging.

to the State Brief's argument, such a claim *should not be decided.*" [Emphasis added.] Nevertheless, in the interest of justice, we consider whether the record establishes *Strickland*'s two prongs.

Regarding the attorney's failure to make an opening statement, an attorney's decision to forego an opening statement is "inherently tactical," *Torode v. State*, No. 02-14-00232-CR, 2015 WL 3917823, at *2 (Tex. App.—Fort Worth June 25, 2015, no pet.) (mem. op., not designated for publication); "[f]ew matters during a criminal trial could be more imbued with strategic implications than the exercise of this option." *Darkins v. State*, 430 S.W.3d 559, 570 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (quoting *Calderon v. State*, 950 S.W.2d 121, 127 (Tex. App.—El Paso 1997, no pet.)). The record is silent about the attorney's reasons for not making an opening statement, and the failure to make an opening statement is not conduct that is so outrageous that no competent attorney would have engaged in it. *Id.* at 569 (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005), for the proposition that "[w]hen the record is silent as to trial counsel's strategy, we will not conclude that appellant received ineffective assistance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it'"). As the State points out, the prosecutor also chose to forego an opening statement. Similarly, a stipulation to a prior conviction can also be a tactical decision. *See Turner v. State*, 471 S.W.2d 56, 58 (Tex. Crim. App. 1971); *see also Patterson v. State*, No. 11-19-00200-CR, 2021 WL 1918876, at *7 (Tex. App.—Eastland May 13, 2021, no pet.) (mem. op., not designated for publication)

(holding that defendant had not established reasonable probability that the result of the proceeding would have been different but for the attorney's stipulation that annulled a defense strategy).

Wade also argues that counsel "did not try to point out any positive aspects of Wade," but Wade does not say what positive aspects he has that should have been presented. He does not argue that there was any specific mitigating evidence available that could have been presented that the attorney failed to introduce or discover. We cannot determine from the record that the attorney's failure to produce positive or mitigating evidence was so outrageous that no competent attorney would have engaged in it. *See Goodspeed*, 187 S.W.3d at 392; *Brennan v. State*, 334 S.W.3d 64, 79 (Tex. App.—Dallas 2009, no pet.) (stating that a claim of ineffective assistance based on counsel's failure to put on mitigating witness testimony fails in the absence of a showing that the defendant would have benefitted from the testimony); *see also McMahon v. State*, Nos. 02-19-00144-CR, 02-19-00145-CR, 2020 WL 579103, at *7 (Tex. App.—Fort Worth Feb. 6, 2020, pet. ref'd) (mem. op., not designated for publication) (stating same).

As for the attorney's failure to argue any reasons for the trial court to order the sentences to run concurrent rather than consecutive, Wade says that the attorney should have emphasized that the complainant was not a "child" but a "teenager old enough to be certified as an adult" and that the fact that Wade did not have a weapon during the assaults or threaten the complainant. However, the teenage complainant was still a child, *see* Tex. Penal Code Ann. § 22.011(c), and we cannot say that the attorney's not

48

emphasizing Wade's lack of weapon was so outrageous that no competent attorney would have engaged in it. *See Goodspeed*, 187 S.W.3d at 392.

## C. Issue Five Conclusion

*Strickland* applies to Wade's complaints about his appointed attorney, and the record does not support his arguments. Accordingly, we overrule Wade's fifth issue.

## Conclusion

Having overruled Wade's five issues, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 16, 2023